ASSOCIATED AVIATION UNDER-WRITERS and Fidelity & Casualty Company of New York

v.

UNITED STATES of America.

No. CA 3–76–0435–C.

United States District Court, N. D. Texas, Dallas Division.

Nov. 22, 1978.

As Amended Jan. 24, 1979.

H. Dudley Chambers and Robert F. Ruckman, Jackson, Walker, Winstead, Cantwell & Miller, Dallas, Tex., for plaintiff.

Nicholas Gilman and Cecile Hatfield, Trial Attys., Aviation Section, Civ. Div., Dept. of Justice, Washington, D. C., Kenneth J. Mighell, U. S. Atty., Dallas, Tex., for defendant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

WILLIAM M. TAYLOR, Jr., District Judge.

These cases against the United States arise under the Federal Tort Claims Act. 28 U.S.C. § 2671, *et seq.* Jurisdiction properly resides in this Court pursuant to 28 U.S.C. § 1346(b), and these cases were tried to the Court commencing on April 17, 1978.

On June 9, 1974, at approximately two minutes after midnight (12:02 a. m.), a Piper PA–23–250, "Aztec E" model aircraft numbered N777AV (formally N777BT) crashed approximately six miles northeast of Cresson (near Fort Worth), Texas, killing all six travelers aboard. These actions arise as a result of that crash.

## FINDINGS OF FACT

1. The aircraft, N777AV, was owned and operated by Air Venture Corporation and Corpening Enterprises respectively. Air Venture Corporation was incorporated as a separate entity from Corpening Enterprises, a wholly owned proprietorship of Mr. A. V. Corpening. The sole business purpose of Air Venture Corporation was to provide quick transportation for A. V. Corpening and other officials in the furtherance of Corpening Enterprises' business. The primary pilot-in-command of N777AV, John Joseph Dittmaier, was an employee of Corpening Enterprises, and the scheduling and use of that aircraft was done through Corpening Enterprises' employees who operated the aircraft with funds from Corpening Enterprises.

2. The officials aboard the aircraft that evening were A. V. Corpening, the president and only director of Air Venture Corporation and the sole owner of Corpening Enterprises, John A. Thornburgh, a rated pilot seated in the copilot's seat who had flown N777AV with Dittmaier and as an official was manager of the gas department for Corpening Enterprises, Rella Scoggins Walters, chief secretary of Corpening Enterprises and corporate secretary of Air Venture Corporation, and Virginia Drennan McKinney, the chief bookkeeper for Corpening Enterprises. Bonnie Thornburgh was a guest accompanying her husband, John Thornburgh. Dittmaier, the pilot-in-command of the flight, was a commercial pilot with instrument and flight instructor ratings for single and multi-engine, land aircraft and instrument and advanced ground instructor ratings also.

3. Prior to the evening of the accident at approximately 11:00 a. m. on June 8, 1974, Pilot Dittmaier spoke with a National Weather Service forecaster in Fort Worth, Texas, about the Fort Worth area forecasted-weather for approximately midnight that evening, thirteen hours ahead. Dittmaier planned to fly to Lubbock, Texas, that afternoon from Fort Worth. He was to pick up the five people in Lubbock and return them to Fort Worth at approximately midnight. The Fort Worth forecaster during their morning conversation informed Dittmaier that he could expect widespread thunderstorms with hail along his proposed return route to Fort Worth and would have to fly through a front on his return flight that evening. Furthermore, the forecaster told Dittmaier that some of these thunderstorms would be locally severe during the time he proposed to return to Fort Worth and that this same thunderstorm weather would continue until after midnight on June 9.

4. The pilot flew to Lubbock as planned, picked up the people in Lubbock on business for Corpening Enterprises, and departed Lubbock for Meacham Field, Fort Worth, at approximately 10:30 p. m. Shortly before departure, Dittmaier mentioned that "they might hit a little wet weather on landing."

5. Dittmaier departed Lubbock with five hours of fuel under an instrument flight rules (IFR) clearance. He estimated that the flight to Meacham Field would take one and one-half hours, and he requested a flight altitude of nine thousand feet. He did not select an alternate airfield in his flight plan.

6. Once airborne, Federal Aviation Administration (FAA) personnel in Lubbock transferred Dittmaier to the enroute air

traffic control located in Fort Worth's Air Route Traffic Control Center. The controller handling Lubbock area traffic (the Lubbock Sector) advised the pilot of N777AV that a line of weather (thunderstorms) that should not be penetrated extended from the Mineral Wells, Texas, area north-northeast to Wichita, Kansas. He further advised that N777AV should reroute by way of Abilene, Texas, to circumnavigate the southern edge of that line of weather seen on the air traffic control radar and he warned that the aircraft might have to proceed as far south as Waco, Texas, to circumnavigate the line. The Lubbock Sector controller also gave the pilot of N777AV the Carswell Air Force Base forecast for within the next hour or so, which called for 1,000 feet overcast with thunderstorms, hail and high winds.

7. Dittmaier decided to alter his proposed route and turned south toward Abilene. He told the controller that he had airborne weather radar aboard and that he would start to watch his radar at Abilene.

8. At approximately 10:47 p. m., the pilot of N777AV called Lubbock Flight Service Station (FSS) for the Dallas-Fort Worth terminal weather. He was given the 10:00 p. m. hourly weather observations for that area and radar reports, also valid for the same time. The FSS specialist also advised Dittmaier during their radio conversation that new radar reports would be available at 11:00 p. m. Dittmaier then departed the FSS radio channel before that new weather information became available.

9. Shortly after 11:00 p. m., Fort Worth Center transferred N777AV temporarily to the air traffic control of Abilene Approach Control located in Abilene. While under the air traffic control of Abilene Approach Control from approximately 11:04 p. m. to approximately 11:36 p. m., Dittmaier left the approach control frequency to talk with the Abilene Flight Service Station.

10. The specialist at Abilene FSS indicated, *inter alia*, in his extensive weather briefing to the pilot that a solid line of thunderstorms existed to the northeast and east of Abilene 10 to 15 miles wide, extending from a line 25 miles southwest of Mineral Wells, Texas, to Denton, Texas. This line was close to and moving toward Fort Worth. The Abilene specialist further indicated the highly visible nature of the line with its continuous lightning in clouds and cloud to cloud and the towering size of the thunderstorm clouds which foretold of the potential severity of these storms.

11. Dittmaier also received from the Abilene FSS specialist information of projected AIRMETs and SIGMETs and Severe Weather Watches which were warnings that when N777AV arrived at Fort Worth the pilot could expect to encounter severe thunderstorms with extreme turbulence and surface gusts to 65 knots and hail one and one-half inches or greater in diameter. The pilot proceeded onwards toward his destination even though the Abilene FSS specialist advised him not to continue his flight at that time due to the forecast severity of the storms in the Dallas-Fort Worth area.

12. The aircraft flew eastward from Abilene, deviating south of its assigned route toward the Acton VOR near Acton, Texas, to avoid a southwestern build-up of this extensive line of thunderstorms. A Fort Worth Center controller, anticipating the need for N777AV to proceed south of course to avoid this line of thunderstorms, had given the pilot prior clearance to deviate south of course "as needed" without further request. The controller provided this anticipatory clearance because of the line of thunderstorms or squall line extending into the path of the aircraft. Dittmaier requested a descent from 9,000 to 6,000 feet which, east of Abilene until approximately 50 miles west of the Acton VOR, would place N777AV below radar coverage and outside direct radio contact with Fort Worth Center. At approximately 11:46 p. m., Dittmaier was advised of the southwestern extension of the line of thunderstorms and its position near Victor 62. He replied that his own radar information showed a solid line on his route; Dittmaier deviated "a little bit south" of Victor 62 to avoid the line.

13. As the aircraft approached the Acton VOR, radio communications with Fort Worth Center informed Dittmaier that the weather was clear along his route toward Fort Worth as that weather appeared on Center Radar at that moment, "everything just lying just north of it [Meacham Field] on a southwest-northeast line." At approximately 11:53 p. m., in an attempt to hasten his arrival to Meacham Field, Dittmaier asked for and received a clearance to fly from his present position direct to Meacham. He stated that he was seeing weather on his radar about twenty miles from his position and requested another southerly deviation to avoid that weather which appeared "a little bit hairy [an intense echo]" on his radar. His radio transmission at approximately 11:55 p. m. reported that the aircraft was in clear weather then at 6,000 feet although he volunteered that he would accept 4,000 feet if the controller wanted him to descend. Several minutes later N777AV passed VFR traffic 8 miles northwest of the Acton VOR which had at approximately 11:45 p. m. been located five miles southwest of Meacham Field flying southwesterly at an altitude below 10,000 feet and probably at or below 5,000 feet.

14. At approximately 11:59 p. m., N777AV first established radio communication with Dallas-Fort Worth Approach Control (Regional Approach Control). Dittmaier then informed the approach controller that his airborne weather radar was starting to show (to paint) weather about eighteen to nineteen miles ahead of the aircraft. In response, the approach controller viewing his own air traffic control radar told the pilot that the weather looked "pretty bad—it's ah—just about a mile north of Meacham right now." Dittmaier then asked if from his present position direct to Meacham, "we are pretty clear [of the weather] as far as you [the approach controller] can tell?" The approach controller stated: "Well, at the present, it is, but—ah—I couldn't guarantee it." This conversation ended with an acknowledgment of "okay" from Dittmaier at forty seconds past 11:59 p. m. The approach controller noted and so testified that the flight path of N777AV was paralleling

and was approximately ten miles southsoutheast of the line of thunderstorms that the approach controller was observing on his radar. He cleared the aircraft to descend from 6,000 to 3,000 feet. The aircraft probably had descended no lower than 4,000 feet before it went out of control and crashed moments later.

15. The approach controller was awaiting the hourly weather observations (weather sequence report) for midnight from Meacham Field. He expected it within a few minutes and he was waiting for that "new" weather to provide the pilot with the most current and pertinent Meacham weather observations obtainable. The approach controller planned to obtain the current Meacham weather and then to suggest a visual approach if N777AV was still in visual conditions with Meacham Field in sight. He never had the opportunity to provide that information to the pilot.

16. Two minutes later the last transmission from N777AV stated that the pilot was once again deviating to the south and was getting into something which was never identified due to interference on the radio frequency. The aircraft disappeared from the radar screen shortly thereafter and was almost totally destroyed in the crash.

17. The line of thunderstorms was influencing the weather and aircraft operations at all airports in the Dallas-Fort Worth area. This line extended northeast-southwest and was five miles north of the Dallas-Fort Worth Regional Airport which was fifteen to eighteen miles to the east and slightly north of Meacham Field when it was one mile north of Meacham. A windshift from a southerly to a northwesterly wind was observed at Carswell Air Force Base, about five miles southwest of Meacham, at 11:17 p. m., and a similar windshift was first noted at Meacham at 11:29 p. m., although the wind shifted gradually and was not an official windshift until 11:51 p. m. Regional Airport also had a similar windshift at 11:53 p. m.

18. These windshifts on the ground were caused by unpredictable outflow or air from

individual storm cells within this line of thunderstorms although the line of thunderstorms itself was still north of the airfields. The flight path of N777AV was from the southwest directly toward Meacham. A storm cell that might have influenced the winds along the flight path of N777AV southwest of Carswell six miles northeast of Cresson was proven to have been west of that position. Whatever cell caused a windshift on the ground at Meacham did not touch the Cresson area. Meacham was to the northeast. The outflow that caused a windshift at Meacham Field was not associated with the windshift at Carswell or any winds six miles northeast of Cresson at 12:02 a. m. on June 9, 1974.

19. The outflow winds registered at all three airfields were of lesser velocity than the southerly winds registered before these windshifts occurred. The winds from these separate outflows were not hazardous at 4,000 or 3,000 feet Mean Sea Level (MSL) and were of interest to air traffic controllers and pilots for aircraft flying at those altitudes near Fort Worth merely to determine the direction of landing and takeoff. The outflow winds were a possible concern only during final approach, landing or takeoff from an airfield due to possible low-level wind shear.

20. Three air carrier aircraft approached and landed at Regional Airport and another made a takeoff at times close to the time of this accident. Each aircraft successfully penetrated into an area of windshift on the ground either on takeoff or landing. One air carrier, Braniff 230, traversed the approximate area of the accident site at 7,000 feet only a few minutes before N777AV traversed that area from 6,000 to 4,000 feet. Braniff 230 successfully landed at Regional several minutes after midnight. Braniff 8415 and American 341 also landed at Regional after the windshift on the ground there at 11:53 p. m. A Delta Air Lines DC–8 aircraft took off to the north in the area affected by the windshift on the ground at Regional several minutes after midnight and flew to within two to three miles of the line of thunderstorms. The pilots of these aircraft and the air traffic controllers handling them showed concern for the line of thunderstorms itself. This concern was expressed in the recorded air-to-ground and interphone conversations, but no pilot hesitated to continue an approach and landing or takeoff when it was learned that the wind on the ground had shifted to the north at his destination or departure airfield.

21. The only testimony of a pilot supported the air traffic controllers' testimony that information of a windshift was not "significant" to N777AV at his descending or assigned altitude six miles northeast of Cresson. Dittmaier would not have been influenced to divert to another destination had he been specifically told about this reported windshift on the ground. In fact, since Dittmaier *had* already been made aware of the windshift through several transmissions on his radio frequency, his conduct clearly showed that he was not deterred by this windshift from proceeding onward to Meacham. No evidence whatsoever was ever introduced to suggest that had Dittmaier been specifically informed of a windshift at Meacham that this information would have changed the course of events in any way.

22. These pilots who took off or landed in the windshift area never reported any turbulence of any kind. Any information related to safety of flight or any encounter with unforecast weather conditions would have required such a pilot report (PIREP). The only way that the air traffic controllers would have known of or foreseen possible turbulence in the flight path of N777AV was to have received such a PIREP. The air traffic controllers handling N777AV during the instant flight testified that since their radars do not show turbulence and since the windshifts at the Fort Worth area airports after 11:00 p. m. were not inherently hazardous nor "significant" weather, the only way they could have known of or foreseen turbulence in the flight path of N777AV would be through a PIREP of turbulence. No ground radar picked up hail along the flight path of N777AV either, although hail had been indicated as associ-

ated with this line of thunderstorms and might have existed as an imperceptible shaft in the path of N777AV.

23. Pilots were trained and advised in 1974 by the Airman's Information Manual and such FAA Advisory Circulars as Aviation Weather (AC 00–6), Severe Weather Avoidance (AC 90–12A) and Thunderstorms (AC 00–24) that thunderstorms are inherently hazardous and should be given a wide berth. Without airborne weather radar, pilots were trained to avoid thunderstorms by twenty miles because these storms could generate severe turbulence even in clear air up to twenty miles away. With airborne weather radar, pilots were trained to avoid thunderstorms from five to twenty miles according to the visual outline of the thunderstorm or line of thunderstorms. Testimony established that Dittmaier was flying ten miles away from and paralleling the line of thunderstorms which gave a visual picture of scalloped edges and fingers which a pilot's training prudently suggested he should avoid by fifteen to twenty miles. Severe storms had been forecast and existed within the line as indicated by cloud tops approaching 60,000 feet, and even though south of the line in clear air, Dittmaier could expect severe turbulence as far as twenty miles from this line of thunderstorms and he could also expect hail to be thrown outward from an overhang or anvil associated with these severe storms.

24. Plaintiffs' case is predicated on an encounter with severe turbulence. Based on the trial evidence, plaintiffs have not shown by a preponderance of the evidence that at the altitude and location of N777AV at 12:02 a. m. on June 9, 1974, that any turbulence existed. Even assuming that turbulence did exist there at that time, plaintiffs have not shown by a preponderance of the evidence that an encounter with turbulence caused the crash of N777AV. Plaintiffs have also failed to prove that the windshift on the ground at Meacham Field had any influence on the flying conditions in the flight path of N777AV at 12:02 a. m. to the southwest of Meacham Field six miles northeast of Cresson, Texas.

## CONCLUSIONS OF LAW

1. This is a suit under the Federal Tort Claims Act and therefore the law of Texas, the place where the alleged acts or omissions occurred, is applicable. 28 U.S.C. § 1346(b); *Richards v. United States,* 369 U.S. 1, 82 S.Ct. 585, 7 L.Ed.2d 492 (1962). It is well settled that the Federal Aviation Regulations, Title 14 C.F.R. have the force and effect of law. *United States v. Schultetus,* 277 F.2d 322, 327 (5th Cir.), *cert. denied,* 364 U.S. 828, 81 S.Ct. 67, 5 L.Ed.2d 56 (1960); *Maryland Casualty Co. v. United States,* 251 U.S. 342, 40 S.Ct. 155, 64 L.Ed. 297 (1920). The Federal Aviation Regulations are notice to the public regardless of actual notice. *Federal Crop Insurance Corp. v. Merrill,* 332 U.S. 380, 68 S.Ct. 1, 92 L.Ed. 10 (1947). A violation of the Federal Aviation Regulations has been held to be negligence as a matter of law. *Gatenby v. Altoona Aviation Corp.,* 407 F.2d 443 (3rd Cir. 1969); *Gas Service Co. v. Helmers,* 179 F.2d 101 (8th Cir. 1950). This is consistent with Texas case law that the violation of a safety statute, ordinance or administrative regulation is negligence as a matter of law. *See Southern Pac. Co. v. Castro,* 493 S.W.2d 491 (Tex.1973); *Sheppard v. Judkins,* 476 S.W.2d 102 (Tex.Civ.App.—Texarkana 1971, ref. n. r. e.); *Murfee v. Phillips Petroleum Co.,* 492 S.W.2d 667 (Tex.Civ.App.—El Paso, 1973, ref. n. r. e.).

2. A pilot must have studied and must know the provisions of the Airmen's Information Manual (AIM) and FAA Advisory Circulars pertaining to his flying activities. *Crossman v. United States,* 378 F.Supp. 1312, 1318–1319 (D.Or.1974); 14 C.F.R. § 61.105; *see also Blount Bros. Corp. v. State of Louisiana,* 333 F.Supp. 327 (D.La.1971). Furthermore, the pilot is charged with that knowledge of those facts which were then material to the safe operation of his flight. *American Airlines v. United States,* 418 F.2d 180, 193 (5th Cir. 1969). *Spaulding v. United States,* 455 F.2d 222, 226 (9th Cir. 1972); *affirming Michelmore v. United States,* 299 F.Supp. 1116 (C.D.Cal.1969) (applying Texas law).

Where dangerous weather conditions are clearly visible or known, a pilot should recognize them through his mandatory weather training, and he is obligated to look out for and avoid these weather conditions. *Black v. United States,* 441 F.2d 741, 743 (5th Cir.), *cert. denied* 404 U.S. 913, 92 S.Ct. 233, 30 L.Ed.2d 186 (1971). 14 C.F.R. §§ 61.93, 61.105, 61.125, 91.5.

■ 3. Air traffic controllers must warn pilots of dangers, including weather dangers, reasonably apparent to the air traffic controllers. *American Airlines v. United States, supra* at 193; *Gill v. United States,* 429 F.2d 1072, 1075, 1076 (5th Cir. 1970). However, there is no duty for an air traffic controller to volunteer weather information to an aircraft under his jurisdiction except in accordance with the applicable air traffic controller procedures manuals, or if the air traffic controller "has previously given such aircraft dangerously inaccurate or misleading information, or perhaps unless he has *actual knowledge of a hazardous current weather condition* which the aircraft may encounter in flight and of which it may not yet be aware." *Rowe v. United States,* 272 F.Supp. 462, 472 (W.D.Pa.1964); (emphasis added); *see Swanson v. United States,* 435 F.Supp. 654 at 661 (S.D.N.Y., decided July 6, 1977).

■ 4. The pilot is primarily responsible for the safe operation of his aircraft and has the final authority as to its operation; the air traffic controller on the ground cannot assume that responsibility and is not to interfere except as specifically required by FAA procedures. *American Airlines v. United States, supra* at 193; *United States v. Schultetus,* 277 F.2d 322, 327 (5th Cir.), *cert. denied,* 364 U.S. 828, 81 S.Ct. 67, 5 L.Ed.2d 56 (1960); *United States v. Miller,* 303 F.2d 703, 710 (9th Cir. 1962); 14 C.F.R. § 91.3. Furthermore, "a pilot has a continuing duty to be aware of danger when, with his own eyes, he can perceive the danger." *Thinguldstad v. United States,* 343 F.Supp. 551, 558 (S.D.Ohio 1972); *accord, Spaulding v. United States, supra* at 227; *Black v. United States, supra* at 743–744.

It is recognized that weather is a vital factor in cross-country flights. It is first of all up to the pilot to determine whether dangerous weather conditions prevail along his intended route. *He must stay on the alert in the course of his flight.* (Emphasis added.)

5. The Abilene FSS specialist re-enforced what Dittmaier had already heard from three other sources. Fort Worth was forecasting severe weather at Dittmaier's proposed time of arrival. The Abilene specialist could advise and suggest that the pilot not continue to Fort Worth at the time, but the final decision was the pilot's. As N777AV approached Fort Worth by way of the Acton VOR, the pilot had to deviate south of what numerous controllers, several FSS specialists and his own radar told him was a thunderstorm squall line of intense severity and great extent.

■ 6. Under Texas law, liability growing out of the operation of aircraft is to be determined by the ordinary rules of negligence and due care. *United States v. Schultetus, supra* at 322. The essential elements of actionable negligence are the existence of a duty on the part of one person to protect another against injury, breach of that duty, and injury to the person to whom the duty is owed as the proximate cause of the breach. *Cody v. Mahone,* 497 S.W.2d 382 (Tex.Civ.App.—San Antonio 1973, ref. n. r. e.). It is well established in Texas that before one can be held liable, his negligent acts must be the proximate cause of the injury sustained. Under Texas law, "proximate cause" is a cause, which in natural and continuous sequence, produces the event and without which the event would not have occurred, and to be the proximate cause of the event, it should have been foreseen by a person exercising ordinary care. *U. S. for the Use and Benefit of Contractors Equipment Co. v. Trinity Universal Insurance Co.,* 457 F.2d 950 (5th Cir. 1972). Proximate cause, therefore, encompasses two elements: (1) cause in fact, and (2) foreseeability. *Clark v. Waggoner,* 452 S.W.2d 437 (Tex.Sup.1970). Foreseeability as an element of proximate cause does not include consequences which arise from unusual occurrences nor is a person bound to anticipate negligent or unlawful conduct on

the part of another. *DeWinnie v. Allen,* 154 Tex. 316, 277 S.W.2d 95, 98 (1955) and *Robertson v. Southwestern Bell Telephone Co.,* 403 S.W.2d 459 (Tex.Civ.App.—Tyler 1966.) Thus, if there is no reason to anticipate injury, no duty arises to act to prevent such unanticipated injury.

7. Throughout the flight of N777AV from shortly after takeoff from Lubbock until just minutes before the accident, air traffic controllers and specialists gave the pilot severe weather warnings, suggested route deviations for his safety and even suggested that he not proceed to Fort Worth given the forecast weather there for his arrival time. The duties of air traffic control include traffic separation and information to the pilot to assist him to decide his own course of action. The final decision of routing and destination rested exclusively with the pilot. *United States v. Schultetus, supra* at 327; *Michelmore v. United States, supra* at 1119; 14 C.F.R. § 91.3. The weather warnings foretold of possibly extremely severe conditions ahead, and these numerous warnings were accurate and pertinent to the projected flight path of N777AV. *Spaulding v. United States, supra* at 227; *compare Gill v. United States,* 429 F.2d 1072, 1077 (5th Cir. 1970).

8. The approach controller's warning of "pretty bad" weather in the vicinity of Meacham Field was a strong reminder of weather conditions that others had already predicted for the pilot at his destination. The official, current weather observations were not given then because the approach controller had not yet received the most current, hourly Fort Worth weather observation. He expected it to be given to him at any minute. The observed weather for the previous hour from Fort Worth would not have been pertinent to the pilot then, and he had already been given that weather earlier from the Abilene FSS.

9. The controllers had no reason to foresee any injury. The aircraft was in clear weather flying through an area recently traversed by Braniff 230 without incident. The existence of windshifts at Carswell, Meacham and Regional had no significance to the controllers in their handling of N777AV. The windshift information was not relayed specifically to N777AV because it presented no recognized or reasonably foreseeable hazard to the aircraft at its assigned altitude and airspeed.

10. Plaintiffs have not met their burden of proving that an encounter with turbulence proximately caused N777AV to crash. Neither have they shown that the windshift at Meacham had any effect on N777AV or that it was inherently hazardous. Speculation does not sustain plaintiffs' burden of proof. *Spaulding v. United States, supra* at 228.

11. Plaintiffs have failed to demonstrate that the air traffic controllers were negligent or that their conduct was in any way the proximate cause of this accident.

12. The federal employees who gave Dittmaier weather information and air traffic assistance did so with due care. They committed no negligence whatsoever in their handling of N777AV on June 8 and 9, 1974, and they violated no duty owed to the pilot or his passengers.

13. Defendant, United States, is entitled to judgment in its favor and is further entitled to costs herein from plaintiff.