Brenda MALLEN, as widow of
Steven Mallen

v.

UNITED STATES of America.

Civ. A. No. C-74-1157-A.

United States District Court,
N. D. Georgia,
Atlanta Division.

· Oct. 9, 1979.

Zimet, Haines, Moss, & Goodkind, New York City, Daniel Donnelly, Garrison, N. Y., for plaintiff.

Douglas P. Roberto, Asst. U. S. Atty., Atlanta, Ga., Robert D. Batson, Civ. Div., Dept. of Justice, Washington, D. C., for defendant.

## ORDER

HENDERSON, Circuit Judge, Sitting by Designation.

On March 21, 1972, Steven Mallen was killed when the single engine light aircraft he was piloting crashed near Jasper, Georgia. His widow brings this suit pursuant to the provisions of the Federal Tort Claims Act, 28 U.S.C. §§ 2671 *et seq.*, claiming negligence by agents of the United States in furnishing air traffic control services, including weather information.[1] The case was tried before the court without a jury. The parties submitted proposed findings of fact and conclusions of law, and the case is now ready for decision.

At about 5:35 P.M., E.S.T., on March 21, 1972, Steven Mallen departed from Probst Field in Concord, North Carolina, heading toward his home in Chattanooga, Tennessee. Earlier, he called the Hickory, North Carolina Flight Service Station (hereinafter referred to as the "FSS") to obtain weather information for his proposed route of flight and to file a flight plan with the FSS. He was furnished a synopsis of the weather information available to the FSS employee on duty, which included a briefing on the weather the FSS employee felt was pertinent to Mallen's proposed route of flight. The FSS advised him that he could expect generally Visual Flight Rules (VFR) conditions with ceilings and visibilities less than VFR in scattered showers or thundershowers. The FSS told him that the Washington area forecast contained a SIGMET[2] and an AIRMET[3] pertinent to his flight route which warned of thunderstorms, possibly in lines and clusters, developing in advance of a cold front, moderate to locally severe turbulence associated with these thunderstorms, and moderate turbulence below twelve thousand feet. Several PIREPS[4] were given Mallen which informed him of moderate to severe turbulence, showers and light clear icing in the area of Chattanooga, as well as a current radar report indicating an area of scattered rain showers and thundershowers thirty nautical miles northeast of Chattanooga. The FSS employee also advised of rough flying conditions if he encountered any thunderstorm activity. Mallen replied that he would ask for radar vectors[5] around the thunderstorms, and would take the southern route around the mountains in an effort to avoid this area. Mallen filed an Instrument Flight Rules (IFR) flight plan with the

---

1. Aetna Casualty & Surety Co., Mallen's employer's workmen's compensation carrier, was allowed to intervene by order of July 20, 1976.

2. "SIGMETs . . . include weather phenomena potentially hazardous to *all* aircraft, specifically:
   a. Tornadoes.
   b. Line of thunderstorms (squall lines).
   c. Embedded thunderstorms.
   d. Hail ¾" or more.
   e. Severe and extreme turbulence.
   f. Severe icing.
   g. Widespread duststorms/sandstorms, lowering visibilities to less than two miles." Federal Aviation Administration, Airman's Information Manual (Part I) 1–79 through 1–80 (Feb. 1972) (hereinafter referred to as "AIM") (Defendant's Exhibit 316).

3. "AIRMETs . . . include weather phenomena of less severity than that covered by SIGMETs which are potentially hazardous to aircraft having limited capability because of lack of equipment or instrumentation, or pilot qualifications and are at least of operational interest to *all* aircraft, specifically:
   a. Moderate icing.
   b. Moderate turbulence over an extensive area.
   c. Extensive areas of visibilities less than two miles and/or ceilings less than 1000 feet, including mountain ridges and passes.
   d. Winds of 40 knots or more at or within 2000 feet of the surface." AIM, at 1–80 through 1–81.

4. A pilot weather report of conditions aloft. "Pilots are urged to cooperate and volunteer reports of cloud tops, upper cloud layers, thunderstorms, ice, turbulence, strong winds, and other significant flight condition information." AIM, at 1–81.

5. A radar vector is "[a] heading issued to an aircraft to provide navigational guidance by radar." AIM, at 1–5.

FSS, but did not provide an alternate route of flight.

At the time of the tragic crash, Mallen was an instrument rated pilot [6] with a little over forty hours of simulated or actual instrument flying time. This barely exceeded the minimum number of hours required in order to obtain an instrument rating. He had been warned against flying IFR at night. In his instruction for both a private pilot license and an instrument rating, he was taught that he should avoid thunderstorms and that they should be given a wide berth—at least twenty miles; some sources advised twenty to thirty miles for severe thunderstorms. He was instructed that hail and severe turbulence, which could quickly cause a dangerous loss of altitude, were associated with thunderstorm activity. One indicator of thunderstorms, according to his lessons, was lightning. He was advised that air traffic controllers could vector him around an area of bad weather if that weather was not too widespread, but was warned not to depend on their radar, that the air traffic controller's primary function was separation of aircraft, and that providing weather information and vectors around weather was a secondary duty, to be performed only when time and traffic permitted. He was informed that the circular polarization feature of the air traffic controller's radar [7] eliminated a certain amount of return from weather. He was cautioned that he should take an alternate route if thunderstorms were forecast, and, if that were not possible, that it would be a "no-go" situation.[8] Mallen also understood that

air traffic controllers should solicit PIREPs if thunderstorms were forecast for an area, and that the PIREPs would be passed along to other pilots. However, he was alerted to monitor his radio and listen for discussions of weather conditions by other pilots.

Mallen's anticipated flight path took him through the jurisdiction of the Atlanta Air Route Traffic Control Center. Airspace in this jurisdiction is divided into "sectors." Each sector is monitored by an air traffic controller, who stands at his station and studies a screen depicting the radar return or "echoes" from a beam which scans his sector. His primary duty is to utilize this information to maintain separation of aircraft in his sector. Time and traffic permitting, he may provide weather information to pilots, including vectors around bad weather.[9]

The testimony at the trial centered on communications between the air traffic controllers and various aircraft, including Mallen's, and "interphone" conversations among the air traffic controllers themselves, during the fifty minute period from 6:40 until 7:30 P.M. the night of the crash.[10] Deciphering these transmissions is crucial to a determination of negligence by government employees, and each party called witnesses who gave their interpretations of each transmission and how it was, or should have been, understood by the conversants. Inevitably, there were conflicting opinions, and, hence, the fact-finding function necessarily involves a resolution of whose version

6. An instrument rated pilot is one who is authorized to fly in less than Visual Flight Rules conditions, i. e., he is qualified to fly by reference to the airplane's instruments, and, thus, is able to operate a plane, for example, at night or in clouds.

7. This phenomenon is more fully explained infra, at 734.

8. The government does not contend that the weather picture presented to Mallen by the Hickory FSS was a "no-go" situation, and the court does not find that such was actually the case. The footnoted finding of fact is made merely as an indication of the pilot's awareness of the danger of thunderstorms to flight.

9. The En Route Air Traffic Control manual describes this duty as follows: "Issue pertinent information on radar observed weather . . . and suggest radar navigational assistance to avoid these areas. Provide this assistance only when the pilot requests it, whether or not you have previously suggested it." Federal Aviation Administration, Pub. No. 7110.9B, En Route Air Traffic Control ⸿ 816(a) (April 1, 1971) (Plaintiff's Exhibit 39; Defendant's Exhibit 309).

10. Transcripts of these transmissions were introduced at trial as Plaintiff's Exhibit 23.

of the meaning of these transmissions is the most credible.[11]

At 6:48:14 P.M., i. e., 48 minutes and 14 seconds after 6 P.M., E.S.T.[12] Mallen was flying east on "V–194."[13] He was advised by Milton Brogdon, who was operating the Commerce low altitude sector, that in about twenty-five miles he would begin picking up some precipitation on his present course, but that if he made a left turn and headed toward Gainesville and then proceeded west on a vector to be provided to him by the controller, he would go south of the heavy precipitation and come to Chattanooga from the southwest. Mallen responded that he would go any way that would keep him out of the heavy precipitation, and suggested to the controller that he could proceed to the Rome VOR.[14] At 6:51:31 he was given vectors to take him south of the weather, and about four minutes later was warned of light precipitation in his path in four or five miles. Mallen replied that he had just come through an area of very light precipitation, and that "the cells"[15] appeared to be off to his right, which meant that he was seeing thunderstorms to the northwest. At this point Brogdon told James R. Galloway, the Crabapple low altitude sector controller, that he was going to vector Mallen south of the weather. Galloway replied that this would not be a problem.

At 6:58:00, in response to an inquiry from Brogdon, Mallen stated that he was in the clouds and encountering some moderate precipitation. Brogdon informed Mallen that if he made a turn to a heading of 230 degrees, he would go south of the weather, which looked like it was moving south-southeast. Mallen made the suggested turn. At 7:01:47, Mallen told Brogdon that he was in pretty rough turbulence and asked him what he was "painting" ahead, i. e., what Brogdon's radar scope was showing along his flight path. Brogdon relayed that he saw an area of moderate precipitation, and that for another three miles or so he would be on the backside of "this cell here." At 7:02:24, Mallen told Brogdon that he was "breaking through" the weather. Between 7:03:00 and 7:03:52, Brogdon warned Mallen that while it was "pretty good ahead" for about forty miles, there appeared to be an area of "real heavy precip" about fifty miles ahead, and that the controller might have to vector him around the south side of it before he reached Rome. Mallen replied that "it's gotten a little bit rough right here just for a moment" and said that he would proceed direct to Rome. About one minute later, Brogdon told Galloway that Mallen was proceeding direct to Rome and that "we may have to vector him to the south of that big ole good'n over there that's up there by Cartersville." In other words, there was an area of weather, possibly a cell, east of Rome around which Mallen might have to deviate. In response to his inquiry, Mallen was given the Chattanooga weather forecast, which included overcast conditions with very light rain, and a PIREP of severe turbulence and downdrafts from a light aircraft coming from Nashville, northwest of Chattanooga, into Chattanooga.

11. It can be assumed that any conflict in the testimony was resolved in favor of the interpretation found to be correct by the court in its findings of fact, and, therefore, no other comment on the credibility of the witnesses, save one, need be made. The court is compelled to comment on the testimony of Samuel P. Saint, a witness offered by the plaintiff as an expert on aviation. There is little doubt that Saint is an experienced pilot. However, rather than relating the facts as he saw them and his opinion testimony based thereon, Saint continuously argued the case for the plaintiff, despite several warnings from the court. See, e. g., Trial Transcript, Vol. III, at pp. 3–181, 3–204, 3–210 through 3–212. Such behavior so clouded his testimony that it is difficult to believe his opinion testimony was unbiased by his obvious enthusiasm for the plaintiff's case. Consequently, his testimony must be regarded as of questionable credibility.

12. The transcripts of these transmissions are marked in Greenwich Mean Time. Translation into Eastern Standard Time is made by subtracting five hours from the times noted.

13. Certain airways are denoted by the letter "V", or "Victor", followed by a number.

14. An omnidirectional signal transmitted as a navigational aid to pilots.

15. A "cell" is a thunderstorm.

From approximately 11 minutes after seven until the transcript ends at 7:30, several large commercial aircraft were taking off from Atlanta International Airport. These aircraft were to proceed up J–91, an airway which runs north-northeast from the Atlanta airport. However, at various times during the recited time span, these aircraft requested deviations to the east of J–91 to avoid bad weather, in some cases described as cells.[16] The plaintiff attempted to prove that these reports of thunderstorms were relevant to Mallen's route of flight once he turned back on a northwesterly course, and, hence, should have been reported to Mallen. It was never established to the court's satisfaction that the reports were pertinent to Mallen's flight path. It was not shown where these aircraft were located when they requested deviations, a crucial factor in determining the relevancy of their observations to Mallen's route. Galloway testified that he thought the weather around which they were turning was up around Harris intersection, a point more than thirty miles away from Mallen's route, a safe distance. There is no evidence to establish the contrary, and, so, it must be concluded that these pilot observations were not pertinent to Mallen's flight path.

What follows is undoubtedly the most critical series of transmissions contained in the transcripts. Because of their importance, they are set out verbatim.

| | | |
|---|---|---|
| 0012:22 [7:12:22] | 17R [Mallen] | ALRIGHT SIR, LOOKS LIKE THERE'S PRETTY HEAVY LIGHTNING OFF AT MY ONE O'CLOCK. WONDER IF WE COULD DROP DOWN TO SIX THOUSAND [FEET] AND TRY AND GET UNDER THAT OVERCAST, AND, UH, WONDER IF I CAN PROCEED, UH, DIRECTLY ON VICTOR FIVE THEN TO CHATTANOOGA |
| 0012:34 [7:12:34] | ATL [Brogdon] | TELL YOU WHAT, I'M GONNA SWITCH YOU TO ANOTHER FREQUENCY, UH, ONE SEVEN ROMEO, [MALLEN] AND, UH, MAKE YOUR REQUEST THERE, I'LL TELL 'EM, UH, OF YOUR REQUEST, GO NOW TO ATLANTA CENTER ON ONE ONE EIGHT POINT NINER |
| . . . . | | |
| 0013:03 [7:13:03] | ATL (1) [Brogdon to Galloway on Interphone] | HE WANTS TO DESCEND, HE'S YOUR CON, HE'S YOUR CONTROL, HE WANTS TO TURN AND GO UP VICTOR FIVE, HE WANTS TO GO DOWN TO SIX, TRY TO GET OUT OF THAT STUFF AND GO UP VICTOR FIVE TO CHATTANOOGA, YOU CAN DO WHATEVER YOU WANT TO WITH HIM [17] |
| | ATL (1) [Galloway to Brogdon on Interphone) | OK |
| . . . . | | |
| 0013:23 [7:13:23] | ATL [Galloway to Mallen] | ONE SEVEN ROMEO, YOU CAN PROCEED DIRECT CHATTANOOGA, DEVIATE YOUR DISCRETION, NORTH OR SOUTH OF COURSE, DESCEND AND MAINTAIN SIX THOUSAND |
| 0013:30 [7:13:30] | 17R | ALRIGHT SIR, WE'RE GONNA DESCEND AND MAINTAIN SIX THOUSAND, I'D APPRECIATE SOME HELP AROUND THIS PRECIP, AND WE'LL PROCEED DIRECT TO CHATTANOOGA. OVER |

16. The commercial air carriers were equipped with airborne radar, and could therefore "see" the weather lying ahead. Mallen's aircraft was not so equipped.

17. This is a "handoff" from Brogdon to Galloway, i. e., Brogdon is transferring control of Mallen's aircraft to Galloway.

| | | |
|---|---|---|
| 00:13:37<br>[7:13:37] | ATL | ALRIGHT SIR, THE ONLY WAY I CAN HELP YOU AROUND IT WOULD BE TO TAKE YOU WEST ABOUT THIRTYFIVE MILES, YOU GOT A SOLID LINE, HOWEVER, AIRCRAFT HAVE GONE THROUGH IT SAID IT'S JUST BEEN LIGHT TO MODERATE PRECIP AND LIGHT TURBULENCE [18] |
| 0013:48<br>[7:13:48] | 17R | ALRIGHT SIR, UH, WE'LL PROCEED DIRECT CHATTANOOGA, BE THE EASIEST WAY, OUT OF, UH, EIGHT THOUSAND FOR SIX THOUSAND |

---

The plaintiff argues vigorously that "Wonder if I can proceed, uh, directly on Victor Five then to Chattanooga" was an inquiry into the meteorological feasibility of proceeding direct to Chattanooga from Mallen's present position. The defendant maintains that this was a request for clearance for a route direct to Chattanooga. From all the evidence, it is apparent that the defendant's interpretation is correct, and when Brogdon relayed the message that "he wants to turn and go up Victor Five, he wants to go down to six, try to get out of that stuff and go up Victor Five to Chattanooga," he was correctly conveying Mallen's intent. Furthermore, Galloway, at this point, offered to help Mallen by taking him around this area of weather. It is equally clear that Mallen refused this offer of aid from the controller and chose to proceed direct to Chattanooga, which, Mallen decided, would be the "easiest", i. e., most expedient, way.

At 7:15:54 Mallen reported that he was not picking up Chattanooga very well, and requested vectors. Galloway responded that he should turn to a heading of 330 degrees. At this time Galloway was sending Mallen toward the "neck", or narrowest part, of a line of precipitation return showing on his radar screen. The neck was about eight to ten miles long and four to five miles wide, while the line itself, about 100 miles long and up to twenty miles wide, extended from around Charlie Brown Airport to up beyond Harris intersection, which is near Young Harris, Georgia.

At 7:17:11 Mallen reported that he was level at six thousand feet, and requested a lower altitude of forty-five hundred feet in order to get out of the clouds. Galloway replied that he was unable to clear him for that altitude at this time, but that he would have it for him in another ten miles. At this point, the traffic Galloway was controlling became moderate. Mallen, at 7:20:32, again requested a lower altitude and reported moderate turbulence and an awful lot of lightning. Galloway was still unable to clear him for a lower altitude. About one minute later, Mallen asked Galloway whether "heading of three three zero still look good to Chattanooga?" Galloway replied that "it's taking you right up Victor five, uh, correction, Victor, fiftyone west, I show you got about a four or five mile stretch of pretty heavy precip, then you should be breaking out in the clear." Mallen responded that he would maintain a heading of 330 degrees.

The last transmission between Mallen and Galloway occurred between 7:24:02 and 7:24:18. The exchange began by Mallen calling out "Atlanta, this is Mayday, One Seven Romeo." Galloway replied that he was still unable to clear him for lower altitude, to which Mallen replied "Mayday, I

---

18. Unfortunately, the tapes of the transmission of these pilot reports to Galloway were destroyed. The government was required by law to retain only those portions of the tape which have been transcribed. See, 44 U.S.C. §§ 2901 et seq.; 44 U.S.C. §§ 3101 et seq.; 44 U.S.C. §§ 3301 et seq. There is no reason to believe that Galloway was not telling Mallen the truth when he reported these pilot assessments. See, J. Wigmore, 2 Wigmore on Evidence §§ 278, 291.

just about got torn apart, there was severe turbulence, thunderstorms, just about got turned over, I'm at thirtyfive hundred feet, over." Galloway replied that he understood, and that his radar screen showed that he "should be breaking out momentarily, you're right over the edge." After this, Galloway, although he tried several times, was unable to contact Mallen again.

Much of the testimony concerned expert opinions, often highly technical, on the capability of an air traffic controller to detect certain weather phenomena with his air traffic control radar. At the time of the incident, the Atlanta Air Traffic Control Center used ARSR radar with an RBDE–5 display. Contrasted with this equipment is the WSR–57 radar used at Athens, Georgia, to determine the weather picture for North Georgia, including the area through which Mallen flew. Each type of radar has a different purpose and different capabilities.

By way of a very general and over-simplified explanation, radar sends out a beam which strikes an object and then bounces back. The signal received when this latter phenomenon occurs is called the "return." The "return" shows up on the radar scope. However, the picture which results from this process is not clearly defined, as compared to, for example, what one might expect from a television set, but gives only a general outline of the object. Thus, a large area of precipitation covering many miles would appear as a large "blob" on the screen.

Generally, the brighter the return on the radar scope, the heavier the precipitation displayed by the ARSR radar. The radar return does *not* indicate the presence of turbulence. The ARSR radar has three features lacking in the WSR–57 radar. These features enhance the ARSR's ability to detect aircraft and the controller's ability to use the ARSR to separate those craft. They are circular polarization, moving target indicator and range normalization. All relate to the radar's ability to detect weather to a certain degree, by affecting the amount of return which shows on the radar scope. The first and third features elimi-

nate the weaker areas of precipitation. The second eliminates return from precipitation, no matter what its intensity, with a mean motion at a ninety degree angle to the beam. The WSR–57 radar, on the other hand, has at least two features not available to ARSR, both of which improve its ability to detect weather. One is a contouring capability. Contouring allows for quantification of intensity levels within an area of precipitation, which, in turn, aids the observer in ascertaining whether any return showing as heavy precipitation is a thunderstorm. WSR–57 radar can also be tilted by the observer. This enables him to see the entire vertical structure of a storm, which, again, is a tremendous aid in determining whether an area of precipitation contains a thunderstorm.

The controller using the ARSR radar does have one means by which he can discover a possible thunderstorm in an area showing precipitation. He must turn his "gain control" until the return from all but the heaviest precipitation is eliminated. However, this leaves him only with the knowledge that what remains is an area of heavy precipitation. Because there is a statistical correlation between areas of intense precipitation and the presence of thunderstorms, he can sometimes conclude the presence of a thunderstorm. By turning his gain control up and down over a span of time, and by marking these areas of heavy precipitation on the glass overlaying the radar scope with a grease pencil, he may, in a somewhat crude fashion, see the movement of these possible cells.

At the trial, the plaintiff produced a series of interesting overlays showing Mallen's route of flight and reproductions of stills taken from a film made by the Athens, Georgia, WSR–57 radar. These overlays show an area of weather, portrayed as a large black cloud, ominously moving to the southeast and directly into Mallen's route of flight. The overlays do *not* depict the return shown on the air traffic controller's radar scope. Interestingly, even these films do not reveal the intensity of the return, and it is only on the frames scanned

vertically by the radar beam that one is able to pick out the thunderstorm cells. The court finds, then, based on the weather actually in existence on March 21, 1972, that an air traffic controller would not be able to determine the existence of a thunderstorm by looking at his radar. He, of course, had the ability to utilize his gain control in an attempt to isolate areas of heavier precipitation and probable thunderstorms. Galloway testified that he could not remember whether he used his gain control to isolate possible cells, although he stated that it would be an automatic reaction for him to do so. This is not sufficient to find that he did or did not do so. Since the plaintiff must bear the burden of proof by a fair preponderance of the evidence, the court is unable to say that Galloway did not attempt to isolate possible cells through the use of his gain control.

In deciding liability under the Federal Tort Claims Act, the court must apply the law of Georgia. 28 U.S.C. § 1346(b); *Richards v. United States*, 369 U.S. 1, 82 S.Ct. 585, 7 L.Ed.2d 492 (1962). In *Chamberlain v. Rycroft*, 114 Ga.App. 292, 293, 151 S.E.2d 172 (1966) (cit. omit.), the Georgia Court of Appeals succinctly set out the four elements necessary to recover on a negligence theory under Georgia law. They are

(1) a legal duty to conform to a standard of conduct raised by the law for the protection of others against unreasonable risks of harm; (2) a breach of this standard; (3) a legally attributable causal connection between the conduct and the resulting injury; and, (4) some loss or damage flowing to the plaintiff's legally protected interests as a result of the defendant's breach of the legal duty.

Federal aviation standards promulgated by statute or regulation must also be followed. *Hartz v. United States*, 387 F.2d 870, 873 (5th Cir. 1968); *Somlo v. United States*, 274 F.Supp. 827 (N.D.Ill.1967), *aff'd*, 416 F.2d 640 (7th Cir. 1969).

■ The regulations and the case law clearly establish that the pilot in command has the primary and ultimate responsibility for the operation of his aircraft. 14 C.F.R.

§§ 61.83(c), 91.3, 91.5(a) (1972): *Yates v. United States*, 497 F.2d 878, 883 (10th Cir. 1974); *Black v. United States*, 441 F.2d 741, 744 (5th Cir.), *cert. den.* 404 U.S. 913, 92 S.Ct. 233, 30 L.Ed.2d 186 (1971); *American Airlines, Inc. v. United States*, 418 F.2d 180, 193 (5th Cir. 1969); *Hartz, supra*, at 873; *United States v. Schultetus*, 277 F.2d 322, 327 (5th Cir.) *cert. den.* 364 U.S. 828, 81 S.Ct. 67, 5 L.Ed.2d 56 (1960); *Associated Aviation Underwriters v. United States*, 462 F.Supp. 674, 681 (N.D.Tex.1978); *Messick v. United States*, 14 Av.L.Rep. (CCH) ¶ 17,290 (S.D.W.Va.1976); *Somlo v. United States, supra*. He must look out for and avoid dangerous weather conditions. *Associated Aviation Underwriters, supra*, at 681.

It is first of all up to the pilot to determine whether dangerous weather conditions prevail along his intended route. He must stay on the alert in the course of his flight. He must listen and give heed to the broadcasts of weather reports that could endanger him and his passengers.

*Black, supra*, at 744. See also, *Messick, supra*. The pilot must be familiar with the Airman's Information Manual and FAA Advisory Circulars, *Associated Aviation Underwriters, supra*, at 681. These materials are admissible as competent evidence of practices customarily followed by pilots, as it relates to the standard of care. *Muncie Aviation Corp. v. Party Doll Fleet*, 519 F.2d 1178, 1180–81 (5th Cir. 1975).

■ Air traffic controllers have a duty to give warnings as required by FAA regulations and the air traffic control manuals. *American Airlines, supra*, at 193. The FAA's "En Route Air Traffic Control" manual provides that the first priority of an air traffic controller is separation of aircraft. Federal Aviation Administration, Pub. No. 7110.9B, En Route Air Traffic Control ¶ 55 (April 1, 1971). The manual instructs the air traffic controller to "[g]ive third priority to additional services to the extent possible." *Id.* "Weather assistance" is categorized as an "additional service." *Id.*, at ¶ 79. This service includes "[p]lan[ning] ahead and suggest[ing] use of alternate routes to avoid known areas of

significant weather." *Id.*, at ¶ 79(a). Provision of additional services is not mandatory, and the air traffic controller decides whether other duties permit the performance of these services. *Id.*, at ¶ 805. With this limitation in mind, the air traffic controller shall

> Issue pertinent information on radar-observed weather ... and suggest radar navigational assistance to avoid these areas. Provide this assistance only when the pilot requests it, whether or not you have previously suggested it. Do not use the word "turbulence" in describing a condition in connection with weather echoes since radar scopes do not show areas of turbulence.

*Id.*, at ¶ 816.

▇ Whether or not required by the manuals, the air traffic controller is required to warn of dangers reasonably apparent to him. *American Airlines, supra*, at 193. Or, his duty to a pilot may rest upon general pilot reliance on a given service.[19] *Gill v. United States*, 429 F.2d 1072, 1075 (5th Cir. 1970). See, *Martin v. United States*, 586 F.2d 1206 (8th Cir. 1978). These duties "in appropriate circumstances, requir[e] due care in providing both current weather information ... and weather forecasts." *Gill, supra*, at 1075. Of course, once the government undertakes to furnish any of these services, it must exercise due care. *Hartz, supra*, at 874; *Ingham v. Eastern Air Lines, Inc.*, 373 F.2d 227, 238 (2nd Cir.), *cert. den.*, 389 U.S. 931, 88 S.Ct. 295, 19 L.Ed.2d 292 (1967); *Dreyer v. United States*, 349 F.Supp. 296, 305 (N.D.Ohio 1972), *aff'd sub nom Freeman v. United States*, 509 F.2d 626 (1975), *mod. sub nom Kalavity v. United States*, 584 F.2d 809 (6th Cir. 1978).

▇ The services provided by the Atlanta Air Traffic Control Center to Steven Mallen on the night of March 21, 1972, were reasonable and performed with due care. Because these services were performed nonnegligently, there is no need to consider whether any possible negligence on Mallen's part was a contributing factor to this tragic occurrence. See *United States v. Schultetus, supra*, at 328.

A review of the findings of fact reveals that Mallen, in exercising his duty as pilot in command, made a conscious choice to attempt to go "direct Chattanooga." Up to and including the time he made this decision, he had been provided with accurate and timely weather information and was not misled by the weather reports furnished him through air traffic control. At the time of his decision, he had been provided with accurate and timely weather information and was not misled by the weather reports furnished him through air traffic control. At the time of his decision, he was informed by Galloway that the only way around the area of precipitation was to deviate thirty-five miles, and that other aircraft had penetrated the line reporting light to moderate precipitation and light turbulence. This was in complete accordance with the controller's duty to suggest a vector around the weather and to supplement the intelligence he was receiving from his radar scope with other pilots' actual weather experiences. Throughout his flight, the only weather information known to the controllers to be pertinent to Mallen's flight path was conveyed to him. Since the controllers never knew, nor could they be expected to know, of thunderstorms in Mallen's path, there was no obligation to provide that information to the pilot. In other words, Mallen knew at least everything about the weather surrounding him which was known by the controllers and had sufficient information to exercise the options available to him as a pilot to avoid the weather. No more can be required of an air traffic controller.

To the extent that any findings of fact set forth in this order are deemed to be conclusions of law or to the extent that any of the foregoing conclusions of law are deemed to be findings of fact, they shall be

---

19. There was no evidence of "general pilot reliance" beyond that set out in the manuals, and any possible duty owed Mallen by the air traffic controllers based on "general pilot reliance" on a particular service cannot be considered.

considered conclusions of law or findings of fact, as the case may be.

### JUDGMENT

A full evidentiary hearing having been held in this matter and both oral and documentary evidence having been presented by all parties, and the court having considered the pleadings, briefs, proposed findings of fact, proposed conclusions of law and arguments of both parties, and the court being fully advised in the premises and having made its findings of fact and conclusions of law directing that judgment be entered herein in favor of the defendant, it is hereby

CONSIDERED, ORDERED AND ADJUDGED THAT

(1) Judgment be entered in favor of the defendant, United States, against the complaint of the plaintiff, Brenda Mallen, and

(2) Said action is dismissed with costs to be assessed against the plaintiff in this matter.