Thomas CROSSMAN and Lucy Crossman, Plaintiffs,

v.

UNITED STATES of America, Defendant.

Civ. No. 72–215.

United States District Court, D. Oregon.

June 7, 1974.

------♦------

Lloyd B. Ericsson, Portland, Ore., for plaintiffs.

William B. Borgeson, Asst. U. S. Atty., Portland, Ore., Michael J. Pangia, Aviation Unit, Dept. of Justice, Washington, D. C., for defendant.

## OPINION

BURNS, District Judge:

Plaintiffs bring this action under the Federal Tort Claims Act, 28 U.S.C. Sec. 1346(b), 2671 et seq. to recover damages resulting from destruction of their private plane which crashed while on its way to Portland International Airport October 9, 1970. Their claim was presented to the Federal Aviation Administration (FAA) and finally denied by that agency on November 5, 1971. Plaintiffs are husband and wife, residents of California. Their plane was a single-engine, four-place 1970 Piper Arrow Model PA–28 R which was "leased back" to an aviation service facility, Progressive Aviation, Ltd. in San Jose, California.

The pivotal issue presented to the Court for decision is whether the air traffic controller, a United States employee at Portland International Airport, owed a duty to Plaintiffs, the breach of which proximately caused the accident in question. Because I find a fatal flaw in Plaintiffs' proof with respect to the proximate cause link, there is no need to reach the questions of the pilot's possible contributory negligence or its imputation to the owners of the plane. Many of the facts leading up to the accident are essentially undisputed, although some of the circumstances surrounding the crash itself will remain forever uncertain or unknown.

Bruce M. Proebstel was a young member of the "Flying Country Club" operated by Progressive Aviation. The club provided airplanes at low rental rates for people who were not individual owners. Proebstel's FAA private pilot certificate was issued on January 15, 1970. By the time of the accident, he had logged 135.3 hours flight time, 10.5 of which were in the Cherokee Piper model plane. In early October, 1970, Proebstel rented the Crossman plane from Progressive Aviation for a trip to Oregon. He left San Jose on October 9 by himself, stopping first in Albany, Oregon, to refuel.

No flight plan was filed. Because Proebstel was not qualified under federal regulations to fly under Instrument Flight Rules (IFR), he was flying under Visual Flight Rules (VFR), 14 C.F.R. 91.105–9.[1]

---

1. VFR is to be used when the weather is such that the flight can be conducted outside of "controlled airspace" designated on aeronautical charts clear of the clouds and with visibility of at least one mile. In low altitude controlled airspace (most commonly within a limited radius of an airport), the pilot must fly 500 feet below, 2,000 feet horizontally from and 1,000 feet above any clouds and have at least 3-mile visibility. At the point of the crash in this case, controlled airspace began 700 feet above ground level.

Official aviation weather observations in the Portland area are taken at hourly intervals at two locations: Portland International Airport and Hillsboro Airport, approximately 15 miles southwest of the main airport.

There was no known radio contact with the aircraft after it left Albany until the pilot contacted the FAA air traffic control (ATC) radar facility at Portland International Airport at 11:22:40 PDT stating:[2]

Portland Approach Control. Cherokee five zero zero four Sierra over Lake Oswego intersection . . uh . . eighteen hundred landing Portland. Over.

The controller at the airport tower told Proebstel to "stand by." The next contact with Proebstel occurred after a two-minute interval and after over twenty communications with IFR aircraft in the immediate vicinity of the airport. If Proebstel had been proceeding along a straight line from Albany to Portland, he would have been following an aeronautical route known as "Victor 23" (V23). V23 passes through Lake Oswego intersection and east of Portland's West Hills television antennas by about 3½ statute miles. Beginning at 11:25 PDT, the following contacts were recorded:

Air Traffic Controller (ATC): Zero four Sierra, say again.

Pilot (P): Portland approach Cherokee five zero zero four Sierra . . uh . . inside Lake Oswego intersection landing Portland. Over.

ATC: You just coming up on the television antennas on the West Hills?

P: That's affirmative.

ATC: Roger. Plan to . . uh . . cross over the airport and enter a downwind North for Runway one zero left radar contact.

P: One zero left. Roger. (11:25:07 PDT)

After that communication, approximately 50 more control tower contacts occurred within the next five minutes with IFR planes. Another controller arrived to assist the man on duty in the tower. (Normally there are two controllers operating these radar positions, however, from 10:30 to 11:30 that morning, only one was on duty to allow for lunch relief.) At approximately 11:30 PDT, the relief controller tried twice to contact "Zero four Sierra." At 11:30:37 the controller who had just come on duty asked the other controller: "Did you get a zero four Sierra okay?" But "Zero four Sierra" was never heard from again.

Wreckage of the plane was found at the base of the group of antennas farthest south on the West Hills, approximately seven nautical miles southwest of the airport. That group consists of four towers owned and operated by Mt. Hood Radio and Television Broadcasting Corporation (KOIN AM, FM and TV), the tops of which are at various altitudes up to 2,049 feet above sea level. Location and height of the subject antennae are identified on the Sectional Aeronautical Chart which was in effect on the date of the accident.[3] Elevation of the terrain

On October 9, 1970, observations taken immediately before and after the accident were as follows:

11:00 A.M.—Portland: 1,200 scattered, measured ceiling 3,100 overcast, visibility 8 miles.

Hillsboro: 1,500 scattered, estimated 3,500 broken, 10,000 overcast, visibility 7 miles.

12:00 P.M.—Portland: 1,500 scattered, estimated 3,500 overcast, visibility 10 miles, very light rain.

Hillsboro: 1,900 scattered, estimated 3,500 broken 10,000 overcast, visibility 7 miles.

The report of cloud conditions is based upon the base of the reported clouds above the terrain at the reporting station and does not necessarily represent the true altitude of the base above mean sea level. The term "scattered" means clouds which cover from $\frac{1}{10}$ to $\frac{5}{10}$ of the total area of the sky at the altitude at which that cloud layer is reported. The term "broken" means clouds which cover $\frac{6}{10}$ to $\frac{9}{10}$ of the sky at the altitude at which that layer is reported. The term "overcast" means clouds which cover 100% of the sky at the altitude at which an overcast layer is reported.

2. These radio contacts are all recorded at the control tower and preserved on tape. At trial, the recording was played and a certified transcript submitted. (Pltf. Ex. 1 & 2)

3. Pltf. Ex. 4 & 5.

in the area where the airplane struck the antenna involved (which was the smallest of the four) is 555 feet.

The best estimate of the flight altitude of the airplane at the time it collided with the antenna was approximately 475 feet above ground level. The time of the crash was approximately 11:27 A.M. The accident resulted in the total destruction of the plane and Proebstel's death.[4]

The pilot's responsibility and the controller's duty are clearly set forth in government manuals for both VFR and IFR aircraft. Plaintiffs contend that Defendant did not follow those regulations in several respects, which Defendant denies. Defendant would place the entire blame for the accident on the pilot's negligence and his failure to abide by the relevant rules. As is often the case, the truth lies somewhere in the middle of these two arguments. Nonetheless, I find that Plaintiffs have not shown by a preponderance of the evidence that any neglect of duty on the part of the controller or his supervisors was a proximate cause of this tragic crash.

I will discuss the allegations of Defendant's negligence in chronological order according to when these duties would have arisen in relation to the time of the accident rather than in the order in which they were initially presented by Plaintiffs:

■ 1. *Failure to follow the ATC procedures manual on radar identification before informing the pilot of the aircraft that he was in radar contact.*

Terminal Air Traffic Control Manual No. 7110.8A provides in Chapter 5, Section 16–1 that Stage II radar service to VFR aircraft will be given after the controller has made radar identification in accordance with approved methods.[5] Whether radar contact was properly or improperly established at that point, if the controller observed the plane heading towards the West Hills and the pilot indicated to the controller that he was aware of the antennas, the controller could properly assume under VFR or even IFR conditions that the pilot would either increase his elevation or veer to one side to avoid the known obstructions. Especially a VFR pilot has no right to rely on the mere notification of "radar contact" as an invisible hand to

---

4. Proebstel's estate did not sue the United States. This action is brought by the plane owners' insurance company.

5. Identification methods are given in Section 3, Paragraph 602, as follows:
   Identify a primary or radar beacon target by using one of the following methods:
   a. Observing a departing aircraft target within 1 mile of the take-off runway end.
   b. Observing a target whose position with respect to a fix (displayed on the video map, scribed on the map overlay, or displayed as a permanent echo) or a visual reporting point (whose range and azimuth from the radar antenna has been accurately determined and made available to the controller) corresponds with a direct position report received from an aircraft, and the observed track is consistent with the reported HEADING or route of flight. If a TACAN/VORTAC is located within

6,000 feet of the radar antenna, the TACAN/VORTAC may be used as a reference fix for radar identification without being displayed on the video map or map overlay.
   c. Observing a target make an identifying turn or turns of 30 degrees or more, provided both of the following conditions exist:
   (1) Except in the case of a lost aircraft, a pilot position report is received which assures you that the aircraft is within radar coverage and within the area being displayed.
   (2) Only one aircraft is observed making these turns.
   602.b Note 2—Visual reporting points used for radar identification are limited to those most used by pilots and whose range and azimuth have been determined by supervisory personnel.

guide him thereafter. Hence, the procedures specifying proper determination of radar contact and any technical departures therefrom are not material to this case.

■ 2. *Failure to follow the ATC procedures manual requirement that a pilot be notified when radar contact is lost after the pilot has once been informed that he is in radar contact.*[6]

For the reasons mentioned in the preceding discussion, this allegation is likewise irrelevant. However, it should be noted in addition that it is perfectly possible, as even Plaintiffs admit, that radar contact was lost at the moment of impact. From the ATC recordings, it certainly appears that the controller knew the plane's whereabouts at least until shortly after 11:25, less than two minutes before the accident is thought to have happened. During this short time span, the controller had several other aircraft in the more immediate vicinity of the airport, and because they were flying under IFR, they were his primary responsibility.

Moreover, Plaintiffs' own expert witness testified that the radar has a "weak spot" near the site of the accident. This expert was Robert D. Rudich, former air traffic controller and Senior ATC specialist for the National Transportation Safety Board (NTSB), now President of Air Transportation Consultants in Virginia. Even he was unable to pinpoint what time after the last communication at 11:25:07 the contact faded.[7] When that uncertainty is coupled with the remaining mysteries of the accident itself, Plaintiffs are left with too slim a reed by which to establish their claim of ATC negligence. This is demonstrated by Plaintiff's expert's answer to my query whether he was es-

timating or guessing the time the aircraft struck the tower.

In accordance with the information which I have reviewed in the NTSB accident package, we are definitely guessing. Even using the time shown there, because at the time in the accident report, when one computes a ground speed from the pilot's initial contact at Lake Oswego intersection; assuming that again the aircraft is precisely dead center over Lake Oswego when that communication is given, and also assuming that the time shown on the transcript is absolutely correct and that is subject to three, four seconds error, these speeds are much too slow, using the whole minute that is thus and thus, 11:27:00 seconds as the time of the accident. I cannot see the accident having occurred quite that late because of the speed, unless the aircraft flew all around Robinhood's barn, so we do have a basic location [sic-lack?] of total accuracy in this area. . . . The expert further admitted that he would be unable to determine whether there was sufficient time for the pilot to have done something to avoid the accident even if Mr. Palmer had notified the pilot of the loss of radar contact.[8]

■ 3. *Failure to warn the pilot that he was approaching the antennas on the West Hills.*

The controller's deposition was taken prior to trial and admitted in its entirety as an exhibit.[9] From that deposition, Plaintiffs argue that the controller knew the antennas were 2,000 feet high and knew that the pilot had last reported an altitude of 1,800 feet. He didn't know

---

6. Id. Para. 601(b).

7. In response to a question from the Court, Plaintiffs' expert admitted that the range could be anywhere from 1825:07 to 1825:43. Tr. p. 61, lines 16–24.

8. Id. p. 65, line 12 through p. 66, line 13.

9. Deposition of William C. Palmer, taken January 25, 1973, Plaintiffs' Ex. 7.

for sure which antennas the pilot acknowledged being near (there is another set of lower antennas south of the West Hills to which the pilot could have conceivably been referring). He knew the airplane's track was west of V23 and in the direction of the West Hills towers. Therefore, Plaintiffs submit that the controller had a duty to warn Proebstel about the possible danger ahead.

Yet a reasonable person could well conclude that the controller's question to the pilot: "Ye just coming up on the television antennas on the West Hills?" [10] either was in fact sufficient warning, or that the pilot's response: "That's affirmative" indicated that there was no warning necessary because he was aware of the obstructions as the rules require he should be, either from keeping a careful lookout or from the markings on the aeronautical charts. See United States v. Miller, 303 F.2d 703 (9 Cir. 1962), cert. denied, 371 U.S. 955, 83 S.Ct. 507, 9 L.Ed.2d 502 (1963); Hamilton v. United States, 343 F.Supp. 426 (N.D.Cal.1971). Indeed, the controller's deposition lends support to this interpretation. Plaintiffs' counsel put the following questions to the controller, Mr. Palmer, and he responded:

Q. Did you give any consideration to advising him [Proebstel] of the TV towers?

A. The transmission would indicate that; I wouldn't have to. [referring to the recorded transcript]

Q. What transmission is that?

A. Well, where I asked him if he had it in sight.

Q. Now, was that question made for the purpose of identifying his blip? [mark on the radar screen]

A. Yes.

Q. It wasn't made specifically for the purpose of warning him that there were towers ahead?

A. No.

Q. As we discussed before, you don't know subjectively whether the pilot was answering the same question you asked?

A. No; of course not.[11]

To be blunt, it appears that counsel was grasping at straws at this point.

■ An air traffic controller communicating with a pilot has the right to rely on the assumption that the pilot knows and will abide by all applicable FAA regulations. On the other hand, the pilot's affirmative duty to know and abide by the rules (and applicable charts of the proposed and possible flight areas) specifically prohibits the pilot's reliance on "outside input" in VFR flights, except to a limited extent where he has been given "vectors" by ATC.[12] The absence of assigned vectors in this case gives rise to the final allegation of negligence directed against the individual controller.

■ 4. *Failure to follow the air traffic procedures manual requirement that a vector be provided when the interest of air safety required it.*

Both the ATC Procedures Manual and the Airman's Information Manual allow but don't require a controller to issue a "vector" (or a compass heading to fly) to aircraft when "in the controller's judgment the vector is necessary for air safety" or when a pilot requests such assistance. In each instance, these provisions are carefully coupled with caveats to pilots:

2. Pilots should clearly understand that authorization to proceed in accordance with such radar navigational

---

10. The transcript uses the spelling "Ye," however since Palmer was not noted speaking thus prophetically in other portions of his dialogues, I think it's fair to assume that the word was more like the colloquial "Ya," as in "What ya gonna do?"

11. Palmer dep. p. 70, lines 11–24.

12. 14 C.F.R. 91.79(c).

assistance does not constitute authorization for the pilot to violate Federal Aviation Regulations. In effect, assistance provided is on the basis that navigational guidance information issued is advisory in nature and the job of flying the aircraft safely, remains with the pilot. . . .

\*　　\*　　\*　　\*　　\*　　\*

5. Radar navigation assistance (vectors) and other radar derived information may be provided in response to pilot requests. Pilots should understand, however, that provision of service under these conditions is not mandatory. It depends on whether the controller can fit it in along with higher priority duties. Many factors, such as limitations of radar, volume of traffic, communications frequency congestion, and controller workload could prevent the controller from providing it. The controller has complete discretion for determining if he is able to provide the service in a particular case. His decision not to provide the service in a particular case is not subject to question.[13]

Plaintiffs claim in this case that "air safety" mandated the controller to vector the aircraft. But it is the controller's contemporaneous judgment of the situation which counts, not Plaintiffs' conclusory hindsight. As discussed above, it appears that the controller considered that there was no need to vector a VFR flight around a permanent obstruction of which the pilot indicated he was aware. A pilot is obligated to familiarize himself with all available information about a proposed flight plan. 14 C.F.R. 91.5. The location and height of the "antenna farm" was clearly marked on the applicable aeronautical section chart. This suffices to refute Plaintiffs' contention of the controller's negligence. Compare Columbia Helicopters,

Inc. v. U. S. By and Through the Bonneville Power Administration, 314 F.Supp. 946 (D.Or.1969).

Although the pilot last reported an altitude of 1,800 feet, at that time he was at least five miles south of the West Hills antennas. If the pilot was using the appropriate sectional chart to identify his location and navigate towards the airport, he would have seen and had ample time to ascend above the towers, in compliance with FAA regulations. The controller had no way of ascertaining the altitude of a blip on his scope (except by pilot reports) and has no duty to monitor the altitude of VFR aircraft,[14] so to find fault with the controller for making the logical assumption that the pilot would climb above the altitude necessary to clear the antennas would be manifestly unjust.

Plaintiffs further maintain that even if the controller is not found to have breached one of the above duties, that he would nonetheless have been able to prevent the fatal crash if only he had had time to follow the aircraft more closely and keep up continual contact with the pilot, which leads to this fifth and last allegation of negligence, directed at those responsible for the administration of airport tower activities:

▆▆▆ 5. *Operating combined duty positions of the north and south approach control positions with only one controller when other controllers were available to man the facility and when the combined position resulted in a heavy workload for the lone controller assigned the job of approach control.*

From 10:30 to 11:30 A.M. the day of the accident, the controller was covering the north and south arrival radar positions so that his co-workers could take a lunch break.[15] When the work load is heavy, the two positions are normally

---

13. Def.Ex. 26, Part I, quoted in Pltf's. Trial Memorandum, P. 7.

14. Terminal Air Traffic Control Manual, p. 37; dep. of Robert Holen, taken December 18, 1973, p. 25; Palmer dep. p. 69.

15. Holen dep. p. 78; Palmer dep. p. 16.

split. The tower has about ten minutes advance notice of IFR anticipated arrival traffic, supplied by computer.

Plaintiffs' expert witness testified that the two operating positions should not have been combined at this time. In his opinion, the controller's "control" work load at the time of the accident was moderate, but his "communications" work load was heavy. The controller himself conceded that his work load at the time of the accident was "heavy," but not "unusually heavy." [16]

The controller, however, positively asserted that: "If I got into a position that I thought was dangerous, I would holler for help." [17] Help was on hand that morning, but at no time did the controller consider it necessary to request his Watch Supervisor to provide relief or to split the positions. Despite this initial evaluation, Plaintiffs claim that the Watch Supervisor has ultimate responsibility to monitor the man's work load, and that in this instance, both the controller's and his supervisor's assessments of the situation were shortsighted and were substantial factors in causing the disastrous collision.

Plaintiffs find some comfort for this stance in the Government's ATS facility evaluation, prepared by Defendant after the accident. An addendum to the report was critical of the work load of the Portland Tower on October 9, 1970, in the following regard:

. . . a review of controller statements and the transcription revealed the following operational discrepancies (not contributory to the accident) which indicate the need for corrective action:

1. In view of the number of persons on duty, combination of the AR–1 and AR–2 positions for lunch relief during this busy period reflects poor judg-

ment on the part of the crew chief and/or watch supervisor as indicated by the following:

a. The controller was unable to reply to N5004S from the time of initial call up for approximately two minutes.

b. After radar contact was established, no additional services were provided and in fact the aircraft was apparently forgotten or not observed for at least five minutes during which time a new controller took over the position.

c. The AR–1 controller was unable to accept a handoff from DR for approximately four minutes.[18]

In response, the Tower Chief stated, and the Government contends in part in its defense to this lawsuit that "regardless of whether or not the positions were combined the majority of the operations were south or in the AR–1 sector" [followed by a list of eight aircraft in the south sector, including Plaintiffs' plane].[19]

Plaintiffs insist that it is the *communications* work load which is crucial in this case. After the Air West plane identified in the previous transcripts had been released "onto the localizer," the controller had four airplanes left to contact, two in each sector. Therefore, Plaintiffs argue, splitting the positions would have halved the controller's work load during the time at issue, thereby allowing time for him to warn the pilot of the towers.

Tower personnel counter this line of reasoning with the following explanation:

N5004S was an aircraft on Expanded Radar Service and takes second priority to IFR traffic. On his (Proebstel's) first call, he was approximately 11 miles south southwest of airport

---

16. Palmer dep. p. 18, line 14; p. 45, lines 1–3.

17. Id. p. 19, lines 5–6.

18. Pltf. Ex. 6: ATS Facility Monitor Report, Portland Tower Accident Package No. 37 Review, October 20, 1970.

19. Def. Ex. 28: Report to Chief, Program Evaluation Branch from A. B. Bush, Chief Portland Tower, dated October 30, 1970.

and on the second contact, when radar identified, was approximately 7 miles southwest of the airport. This would reflect approximately 120 miles per hour ground speed. It is not unusual to ask a VFR aircraft on ERS to stand by when IFR traffic is in the area and a light, slow aircraft will not be delayed . . . Figuring on the above basis, it would take N5004S from 5–7 minutes to reach downwind leg for Runway 10L after receiving instructions at 1825. At 1838 [20] Mr. Schmidt relieved Mr. Palmer and at 1830, Mr. Schmidt made two attempts to contact N5004S with no results . . . The fact that the aircraft was on ERS, no other service would normally be given until the aircraft reported downwind leg for traffic sequencing . . . It is not unusual for aircraft to call for landing at Portland to take advantage of ERS and later find they have landed at Pearson or Evergreen airports.[21]

This official rationale was buttressed by the controller's answers to Plaintiffs' counsel:

Q. Had you had fewer airplanes, or had these other airplanes not come in during the period of time after 04-Sierra talked to you the second time, would you have had any other communications with 04-Sierra?
. . .

A. Not necessary—well, yes, possibly.

Q. With respect to what?

A. Switching him to the tower frequency.

Q. At what point is the switch to tower frequency made?

A. When they are within a certain distance from the airport.

Q. What distance is that?

A. It varies. It would average four miles . . .

Q. When the contemplation is that the airplane will cross over the airport and enter downwind north, which I believe are the instructions you gave the pilot of 04-Sierra, at what distance would you give a tower hand-off?

A. I don't give a tower hand-off.

Q. You would simply instruct the pilot to contact the tower; is that right?

A. That is right.

Q. And what distance would that be under these circumstances of downwind north?

A. Well, based on the work load, it would be approximately four miles from the airport.

Q. From the south boundary?

A. Four miles from the downwind leg.[22]

For the purposes of my analysis, even if Plaintiffs' fifth allegation of negligence with respect to the combined tower positions were found to be valid, their case must fail because of the findings I have already made concerning their first four claims. The controller's workload, although perhaps hindsight reveals that it should have been lighter, is irrelevant when considered together with his lack of any causative breach of duty to the pilot. In any event, the controller would not normally have communicated with the aircraft again until it was approximately four miles from the airport, no matter how light the tower work load was, and the antennae are well beyond that distance.

Accordingly, I conclude that Plaintiffs have failed to meet their burden of proof in this case. Defendant shall prepare an appropriate order of judgment.

This opinion shall serve as findings of fact and conclusions of law in accordance with provisions of F.R.Civ.P. 52.

---

20. Throughout this Opinion the times used have been Pacific Daylight Times. In quoting from this exhibit, however, I have left the times as Greenwich Mean Time, as were used in the exhibit. The reference to 1838 is an obvious mistake for 1828.

21. Id., pp. 1–2.

22. Palmer dep. p. 40, line 16; p. 41, line 23.