**Alice Yvonne McDANIEL, individually and as a Special Administratrix of the Estate and Heirs of Jackson Lee McDaniel, David Brian Colwell and Kevin Wade McDaniel, Deceased, Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

No. C 81–4354 SAW.

United States District Court, N.D. California.

Dec. 29, 1982.

Gerald C. Sterns, John C. Elstead, Sterns, Smith, Elstead & Walker, San Francisco, Cal., for plaintiff.

Joseph P. Russoniello, U.S. Atty., Warren A.. Schneider, Trial Atty., San Francisco, Cal., for defendant.

## FINDINGS OF FACT, CONCLUSIONS OF LAW, AND JUDGMENT

WEIGEL, District Judge.

This action for wrongful death brought under the Federal Tort Claims Act, 28 U.S.C. § 1346(b) et seq., was tried to the Court beginning on November 16, 1982. The Court, having duly considered the evidence and the contentions of counsel, makes the following findings of fact and conclusions of law pursuant to Rule 52 of the Federal Rules of Civil Procedure.

## FINDINGS OF FACT

1. Plaintiff, Alice Yvonne McDaniel, is the widow of Dr. Jackson Lee McDaniel and was the mother of David Colwell and Kevin McDaniel. Dr. McDaniel, David, and Kevin were killed in a plane crash on August 15, 1980.

2. At the time of his death, Dr. McDaniel was 42 years of age and was engaged in the practice of orthopedic surgery.

3. Most of the times given in the Federal Aviation Administration ("FAA") records involving this case are given in Greenwich Mean Time, seven hours later than Pacific Daylight Time. Since the events surrounding the crash occurred in California during Pacific Daylight Time, that time will be used here.

4. On Friday, August 15, 1980, at approximately 8:30 p.m., Dr. McDaniel departed from Buchanan Field, Concord, California, on a planned flight to Truckee, California. The purpose of the flight was to visit property that Dr. McDaniel and plaintiff owned at Squaw Valley, California. The passengers were plaintiff's sons, David Colwell, 17 years old, and Kevin McDaniel, 10 years old, and a neighbor of the McDaniels', John Naylor. At approximately 9:16 p.m., the plane crashed into a mountain ridge nine miles south-southwest of the Truckee Airport. All on board were killed.

5. The plane had power on at the time of the crash. The smashed RPM gauge showed 3,000 RPM. The plane was flying wings level when it hit the ridge; if there was any descent angle, it was very slight. The plane was flying at a 015 degree magnetic course and hit a 8,350 feet high mountain ridge approximately fifty (50) feet below the top of the ridge. Had the plane cleared the ridge, this course would have taken it directly into Truckee Airport. The clock in the plane was stopped at 9:16 p.m. There was no pre-impact or post-impact fire involving the plane nor any sign of engine or fuel problems at the crash site.

6. Dr. McDaniel was a relatively experienced pilot. He had approximately 500 hours total flying time, and was qualified to fly pursuant to Instrument Flight Rules ("IFR"). Dr. McDaniel had flown at night several times a year for approximately the previous six years. On August 15, 1980, he was flying his own plane, a Cessna T–210.

7. Dr. McDaniel was familiar with the terrain on his planned route, since he had flown from Concord to Truckee on numerous prior occasions. He had never flown from Concord to Truckee at night before, but had flown into Truckee at night from Reno, Nevada.

8. On Friday, August 15, 1980, Dr. McDaniel worked a full day, then came home, had dinner, and watched part of a football game prior to leaving for Buchanan Field.

9. Dr. McDaniel did not file a flight plan prior to departure from Buchanan Field.

The filing of a flight plan is not required prior to undertaking a flight pursuant to Visual Flight Rules ("VFR"), but the FAA recommends that it be done. The filing of such a plan would have alerted Dr. McDaniel to the terrain elevations along the proposed route and the appropriate location to commence his descent into Truckee.

10. The weather on the evening of August 15, 1980, was clear. Visibility at Truckee Airport was thirty (30) miles. Sunset was at approximately 8 p.m. It was a dark night with little moon. Dr. McDaniel's departure was after dark; hence, he must have been aware of the darkness of the evening when he started the flight. There is no evidence there was any necessity in making the flight that evening.

11. The entire flight was conducted pursuant to VFR.

12. After his departure from Buchanan Field, Dr. McDaniel contacted Sacramento Approach Control seeking VFR advisories to Truckee. These communications were routine. Shortly thereafter Sacramento Approach Control transferred the flight to the FAA Traffic Control Center Oakland ("Oakland Center") at Fremont, California, since the plane was heading into an area covered by that facility.

13. The airspace covered by Oakland Center is divided into five sectors. The area west of Lake Tahoe into which Dr. McDaniel was moving was covered by the D/R 44 Sector. The only air traffic controller ("ATC") manning that sector at that time was Mr. James Cahill. Mr. Cahill was qualified to man all five sectors covered by Oakland Center.

14. Each sector at Oakland Center has a read-out scope ("scope") showing a computerized display of radar data. The information available to Mr. Cahill on the D/R 44 Sector scope concerning Dr. McDaniel's plane, which was equipped with a transponder, was the plane's identification number, its speed, and its altitude above mean sea level, accurate to within plus or minus fifty (50) feet. This data was updated every twelve (12) seconds. Nothing on Mr. Ca-

hill's scope indicated the height of the terrain or the altitude of Dr. McDaniel's plane above that terrain.

15. The location of the Truckee Airport and the Tahoe very-high frequency omnirange ("VOR"), a navigational aid, were marked on Mr. Cahill's scope. Also visible on his scope was the outline of Lake Tahoe.

16. In carrying out his duties, an ATC uses on a regular basis a controller's chart, which does not give terrain elevations. Mr. Cahill had access to a controller's chart. A VFR pilot cannot expect to be told his altitude above ground because such information is not readily available to the ATC.

17. Mr. Cahill knew that the altitude of the Tahoe VOR was between approximately 8,000 and 9,000 feet. Its exact altitude is 8,885 feet. To ascertain terrain elevations for other locations on his scope, Mr. Cahill would have had to stand up from his seat at his scope and move to his left several feet to examine a sectional chart displayed at a height above his head. The sectional chart is overlayed by a minimum vectoring altitude chart. Both charts are covered by glass and lighted from the rear. It would have taken Mr. Cahill from 30 to 90 seconds to locate Dr. McDaniel's position, at any given time, on the sectional chart and to determine the approximate elevation of the terrain at that location. To do so, Mr. Cahill would have had to divert his attention from his scope and his other responsibilities.

18. In response to a statement by Dr. McDaniel at 9:05:51 that he would like to climb to 12,500 feet to clear the mountains, Mr. Cahill at 9:06:00 responded in part: "I don't know your elevation above ground."

19. Following several routine communications between Mr. Cahill and Dr. McDaniel, at 9:07:17 Mr. Cahill advised Dr. McDaniel of another plane twelve (12) miles ahead of him and also eastbound. This service was provided at Dr. McDaniel's request. Pilots are made aware of such traffic advisory services by paragraph 162 of the Airman's Information Manual ("AIM"), which provides:

162. RADAR TRAFFIC INFORMATION SERVICE

This is a service provided by radar air traffic control facilities. Pilots receiving this service are advised of any radar target observed on the radar display which may be in such proximity to the position of their aircraft or its intended route of flight that it warrants their attention. This service is not intended to relieve the pilot of his responsibility for continual vigilance to see and avoid other aircraft.

a. Purpose of the Service:

(1) The issuance of traffic information as observed on a radar display is based on the principle of assisting and advising a pilot that a particular radar target's position and track indicates it may intersect or pass in such proximity to his intended flight path that it warrants his attention. This is to alert the pilot to the traffic so that he can be on the lookout for it and thereby be in a better position to take appropriate action should the need arise.

\* \* \* \* \* \*

b. Provisions of the Service:

(1) Many factors, such as limitations of the radar, volume of traffic, controller workload and communications frequency congestion, could prevent the controller from providing this service. The controller possesses complete discretion for determining whether he is able to provide or continue to provide this service in a specific case. His reason against providing or continuing to provide the service in a particular case is not subject to question nor need it be communicated to the pilot. In other words, the provision of this service is entirely dependent upon whether the controller believes he is in a position to provide it. Traffic information is routinely provided to all aircraft operating on IFR Flight Plans except when the pilot advises he does not desire the service, or the pilot is operating within positive controlled airspace. Traffic information may be provided to flights not operating on IFR Flight Plans when requested by pilots of such flights.

\* \* \* \* \* \*

20. The plane Dr. McDaniel was overtaking, a Cessna 205, was destined for an airport in eastern Nevada. At 9:10:36, Dr. McDaniel informed Mr. Cahill that he had sighted the plane. At 9:10:39, Mr. Cahill asked Dr. McDaniel to confirm that the latter intended to land at Truckee. At 9:10:44, Dr. McDaniel confirmed that Truckee Airport was his destination by stating: "We're going into Truckee. We'll be making a left turn shortly."

21. Mr. Cahill then stated, at 9:10:47: "OK, uh, four three bravo, roger. You should probably start down before you get too close to him, I guess." This statement was a continuation of the traffic advisory given by Mr. Cahill at 9:07:17. At 9:10:52 Dr. McDaniel responded: "OK."

22. Considering all the circumstances, including the type of information VFR pilots anticipate receiving from an ATC, the context in which the statement was made, and the duty of a VFR pilot to provide his own separation from terrain, the statement made by Mr. Cahill at 9:10:47 was not a suggestion to descend to a dangerously low altitude and a prudent and reasonable pilot would not have interpreted it as such.

23. Approximately three and one-half minutes later, at 9:14:23, Mr. Cahill instructed Dr. McDaniel to reset his transponder and said "Good night," indicating that traffic advisory services were being terminated since, in the descent into Truckee, the plane would go behind the mountains and thus radar coverage would be lost by Oakland Center. Dr. McDaniel acknowledged this termination of services at 9:14:26 and replied: "Good night. Thank you, sir."

24. Dr. McDaniel's plane appeared on Mr. Cahill's Scope for the last time at 9:14:19. After that time, the plane was below radar coverage. At 9:14:19 the plane was at an altitude of 9,200 feet and was located approximately one-half mile from a 9,000 foot mountain peak.

25. Approximately 90 seconds before Dr. McDaniel's plane disappeared from Mr. Cahill's scope, the plane passed over Squaw Valley, California. The lights of Squaw Valley are very visible at night. In addition, the lights of Truckee Airport were on at the time and are visible from the crest of the ridge into which Dr. McDaniel crashed.

26. Shortly after his last communication with Oakland Center, Dr. McDaniel contacted the UNICOM operator at Truckee Airport. UNICOM is a privately-owned facility at that airport which provides information and assistance to pilots. Dr. McDaniel inquired as to conditions at the airport and was given the appropriate runway on which to land, weather conditions, and an altimeter setting. These communications were routine.

27. Dr. McDaniel's plane crashed at approximately 9:16:00.

28. Dr. McDaniel's plane was equipped with Distance Measuring Equipment ("DME"), which he normally used while in flight. The DME provided Dr. McDaniel with an accurate determination of his location during the flight, including when the plane had passed beyond the Tahoe VOR. Information available to Dr. McDaniel from the DME is not automatically relayed to an ATC who is providing services to the plane.

29. At all times during the flight, and certainly after the plane disappeared from Mr. Cahill's scope, Dr. McDaniel had information concerning the plane's location in relation to terrain that was superior to that available to Mr. Cahill.

30. Defendant's air traffic control expert, Mr. Beaudoin, testified that an ATC has an obligation to monitor VFR traffic. His testimony as a whole, the testimony of other witnesses, and other evidence indicates that while this obligation may include a duty to provide continuing traffic advisories once such advisories are requested, it does not require[1] an ATC to monitor changes in the altitude above ground of VFR traffic, absent knowledge on the part of the ATC of an emergency. Under the circumstances of this case, Mr. Cahill could not have monitored Dr. McDaniel's altitude above ground without leaving his scope and neglecting his duty to provide navigational assistance and traffic separation to IFR aircraft. An ATC's duties require that he leave his scope only in an emergency.

31. Nothing in Dr. McDaniel's conduct at any time during the flight did or should have indicated to Mr. Cahill that Dr. McDaniel was unsure of his location, or was unsure of his altitude above terrain, or that an emergency of any kind existed. Mr. Cahill knew that Dr. McDaniel intended to land at Truckee; the latter's decision when to commence his descent and the rate of that descent was his and his alone. Further, it was reasonable and prudent for Dr. McDaniel to descend to some extent following the 9:10:47 transmission from Mr. Cahill to Dr. McDaniel in order to ensure separation from the Cessna 205. Mr. Cahill had no way of knowing what course of action Dr. McDaniel would follow once the last radar "hit" indicating his location had been received and once Mr. Cahill had terminated services. Thus, there was no reason for Mr. Cahill to assume that, after the last radar hit at 9,200 feet, Dr. McDaniel would continue his landing approach into a known hazardous area and crash into a mountain ridge that had a maximum elevation of 8,350 feet.

32. Paragraph 163 of AIM, as well as similar language in paragraph 33 of the Air Traffic Control Manual, provides:

### SAFETY ADVISORY

a. A safety advisory will be issued to pilots of aircraft being controlled by ATC if the controller is aware the aircraft is at an altitude which, in the controller's judgment, places the aircraft in unsafe proximity to terrain, obstructions or other aircraft. The provision of this service is contingent upon the capability of the controller to have an awareness of a situation involving unsafe proximity to terrain, obstructions and uncontrolled aircraft. The issuance of a safety advisory cannot be mandated, but it can be expected on a reasonable, though intermittent basis. Once the advisory is issued, it is solely the pilot's prerogative to determine what course of action, if any, he will take. This procedure is intended for use in time critical situations where aircraft safety is in question. Noncritical situations should be handled via the normal traffic advisory procedures.

Note one to paragraph 33 of the Air Traffic Control Manual provides:

33. Note 1.—The issuance of a safety advisory is a first priority (see paragraph 22) once the controller observes and recognizes a situation of unsafe aircraft proximity to terrain, obstacles, or uncontrolled aircraft. Conditions such as workload, traffic volume, the quality/limitations of the radar system, and the available lead time to react are factors in determining whether it is reasonable for the controller to observe and recognize such situations. While a controller cannot see immediately the development of every situation where a safety advisory must be issued, the controller must remain constantly alert for such situations and issue a safety advisory when the situation is recognized.

33. It was reasonable for Mr. Cahill not to give Dr. McDaniel a safety advisory concerning the latter's proximity to terrain at any time during the flight, given the following circumstances and considerations. First, Mr. Cahill told Dr. McDaniel that he did not know his elevation above ground. Second, based upon information available to Dr. McDaniel from the DME, upon Dr. McDaniel's ability to see portions and outlines of the ground and lights on the ground, upon Dr. McDaniel's familiarity with the terrain, and upon the difficulties Mr. Cahill faced in attempting to determine the plane's altitude above terrain, Dr. McDaniel had better knowledge of his elevation above ground than did Mr. Cahill. Third, Dr. McDaniel had to descend at some point to land at Truckee and it was his responsibility to decide when to do so. Finally, the last radar hit showing Dr. McDaniel's location on Mr. Cahill's scope was at 9,200 feet, well above the crest of the ridge into which Dr. McDaniel crashed, which has an elevation of 8,350 feet.

34. Mr. Cahill performed all the duties required of him in the handling of a VFR flight in proper fashion and without any negligence on his part. There is no evi-

dence of any negligence by any employee or agent of defendant, United States of America.

35. This tragic plane crash was caused solely by the negligence of the pilot of the plane, Dr. Jackson Lee McDaniel.

## CONCLUSIONS OF LAW

1. This Court has jurisdiction over the subject matter of this action pursuant to the Federal Tort Claims Act, 28 U.S.C. § 1346(b) *et seq.* Under the terms of that statute, the law of the State of California applies in this case.

2. Under California law, actionable negligence requires (a) a legal duty to use due care; (b) a breach of such legal duty; and (c) the breach as a proximate or legal cause of the resulting injury. 4 Witkin, Summary of California Law, Torts § 488, at 2749 (8th ed. 1974).

3. "Each pilot in command shall, before beginning a flight, familiarize himself with all available information concerning that flight." 14 C.F.R. 91.5 (1982). This requirement includes familiarizing himself with the terrain over which he will be flying. *See Crossman v. United States,* 378 F.Supp. 1312, 1319 (D.Ore.1974).

4. The AIM is evidence of the standard of care to which a pilot is held, and it is assumed that all pilots have read and are familiar with its provisions. *In Re N–500L Cases,* 691 F.2d 15, 28 (1st Cir.1982).

5. A VFR pilot has the duty to operate his aircraft, to navigate the aircraft, and to provide his own separation from obstructions. *See Spaulding v. United States,* 455 F.2d 222, 226–27 (9th Cir.1972); *Baker v. United States,* 417 F.Supp. 471, 484–85 (W.D.Wash.1975). This duty stems from the VFR pilot's superior ability to gather information from his instruments, to see obstructions and other aircraft, to maneuver his aircraft to avoid such obstructions, and from his limited area of concern—his own aircraft and the area immediately surrounding it. *Mattschei v. United States,* 600 F.2d 205, 208 (9th Cir.1979).

6. As a VFR pilot, Dr. McDaniel had no right, and could not reasonably expect, to rely on "outside input" from the ATC to provide his separation from terrain. *Crossman, supra,* at 1318.

7. As a VFR pilot, Dr. McDaniel had a continuing duty to be aware of his location, of the elevation of the terrain over which he was flying, and of the danger posed by such terrain. He was negligent in not fulfilling these duties, and that negligence was the proximate and sole cause of this tragic plane crash.

8. An ATC must exercise ordinary care in his work. *Baker, supra,* at 486. He must give pilots for whom he is providing services all information and warnings specified in his manuals. *Spaulding, supra,* at 226.

9. Under the circumstances of this case, Mr. Cahill was not negligent in making the 9:10:47 transmission to Dr. McDaniel. Nor was Mr. Cahill negligent in not giving Dr. McDaniel a safety advisory concerning the latter's elevation above ground. Finally, Mr. Cahill was not negligent in terminating services to Dr. McDaniel when he did so.

10. To find defendants negligent in this case would require that Mr. Cahill be held to an obligation higher than that of the exercise of ordinary care. *Baker, supra,* at 488.

11. Defendant, United States of America, breached no duty owed to plaintiff in this case.

12. To the extent any finding of fact constitutes a conclusion of law, it is adopted as such and to the extent any conclusion of law constitutes a finding of fact, it is also adopted as such.

## JUDGMENT

Accordingly,

IT IS HEREBY ORDERED that judgment is entered against plaintiff, Alice Yvonne McDaniel, and in favor of defendant, United States of America.