Cecile **HUNTER, as Personal Representative of the Estate of Neil Hunter, deceased, on behalf of Cecile Hunter, surviving spouse, and the Estate of Neil Hunter, Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

No. 94–816–CIV–ORL–18.

United States District Court,
M.D. Florida.

April 3, 1997.

John Robert McDonough, McDonough, O'Dell, Beers, Weiland, Williams & Krakar, Orlando, Bill Hoppe, Hoppe, Backmeyer & Stokes, P.A., Miami, for Cecile Hunter.

Karen L. Gable, U.S. Attorney's Office, Middle District of Florida, Orlando, Robert G. David, Jr., U.S. Dept. of Justice, Torts Branch, Civil Division, Washington, DC, David M. Wiegand, Federal Aviation Administration, General Litigation Branch, Washington, DC, for U.S.

## ORDER

G. KENDALL SHARP, District Judge.

This action was tried before the court without a jury from March 17th–19th, 1997. Plaintiff Cecile Hunter, as personal representative of the estate of Neil Hunter, brings this instant action against the United States of America pursuant to the Federal Tort Claims Act, codified at 28 U.S.C. § 2675 (1994) (FTCA), alleging that the Federal Aviation Authority and one of its air traffic controllers was negligent in the performance of his duties which led to the death of her husband, Neil Hunter. In her amended complaint, the plaintiff seeks damages for loss of support, services, companionship, protection, net accumulation of the estate and the airplane, coupled with damages for pain and suffering and funeral expenses. Pursuant to Rule 52(a) of the Federal Rules of Civil Procedure, the court makes the following findings of fact and conclusions of law.

### I. Findings of Fact

The facts of this case are uncontroverted by the parties and are as follows. On October 24, 1992, Neil Hunter was piloting his experimental "Velocity" aircraft under Visual Flight Rules (VFR) southeast across the state of Florida from Apalachicola to Merritt Island. During his flight, the Velocity entered the Terminal Control Area (TCA) of Orlando, Florida and was placed under the authority of an air traffic controller (ATC) located at Orlando International Airport. While the Velocity was traveling within the Orlando TCA, a Boeing 727 commercial aircraft operated by Delta Airlines, Inc. approached the vicinity of Hunter's aircraft. While the Delta 727 (Delta) and the Velocity were traveling similar parallel courses, the Delta was flying 500 feet higher at an altitude of 10,000 feet and traveling approximately 150 knots faster than the Velocity. When the two planes came within five miles of one another, the ATC advised the Delta that an experimental aircraft was flying at 9,500 feet, heading southeast and located at one o'clock. The controller then advised Hunter that the Delta was above him at 10,000 feet, and would be passing him on the left hand side. Both aircraft confirmed the controller's advisory. Less than a minute later, Hunter requested clearance from the controller to change altitudes due to clouds ahead and the controller instructed him to descend to 7,500 feet. Ten seconds following the ATC's authorization, the Delta informed the controller that they could see the Hunter aircraft. The ATC then instructed the Delta to maintain visual separation with the Velocity and to descend and maintain 7,000 feet. Delta proceeded to pass the Velocity on its left hand side with a mile of horizontal separation and roughly a 1,000 feet vertical separation between the two aircraft. While not evident in the controller's log, the parties have stipulated that the Velocity pilot saw or should have seen the Delta pass by.

After the passage, the controller instructed the Delta to turn left, extending its distance away from the Velocity, and to contact Orlan-

do approach control to prepare for its landing instructions. Delta complied with the ATC's instructions. A short time later, the Velocity made a thirteen degree left turn back toward Merritt Island and the Delta flight path. The Velocity then apparently encountered wake turbulence created by the Delta and lost control of his aircraft. Three minutes and sixteen seconds and 6.06 miles after the Delta passed the Velocity, the Velocity transmitted a "mayday" emergency call and stated that his aircraft was out of control. Unfortunately, Mr. Hunter was unable to regain control of his flat inverted stall and ultimately perished when his plane crashed near Apopka, Florida, approximately thirty miles northwest of Orlando, Florida.

## II. Conclusions of Law

The issue before the court is whether the ATC was negligent in the performance of his duties which led to the untimely death of Neil Hunter. The court has jurisdiction over the case pursuant to 28 U.S.C. § 1346(b) (1994).

The plaintiff brings this instant claim under the FTCA which states in pertinent part that a plaintiff may recover "for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred." 28 U.S.C. § 1346(b) (1994). Because the alleged tortious act occurred in the state of Florida, Florida negligence law will be applied in the present suit. Under Florida law, in order for a plaintiff to prevail in a negligence action, he/she must show: 1) that the defendant owed a duty of reasonable care to the plaintiff; 2) that the defendant breached that duty; 3) that the breach was the proximate cause of the injury to the plaintiff; and 4) that the plaintiff suffered damages. *Krehling v. Baron*, 900 F.Supp. 1578, 1582 (M.D.Fla.1995) (citing *Hasenfus v. Secord*, 962 F.2d 1556, 1559 (11th Cir.1992), *cert. den.*, 506 U.S. 1051, 113 S.Ct. 972, 122 L.Ed.2d 127 (1993)). The standard of care applicable to negligence actions is one of

reasonable care; "that which a reasonably careful, prudent, and cautious person would use under the circumstances." *Foster v. United States*, 858 F.Supp. 1157, 1162 (M.D.Fla.1994) (citing *Hensley v. United States*, 728 F.Supp. 716, 721 (S.D.Fla.1989)).

In her amended complaint, plaintiff contends that the ATC was negligent in his handling of the Velocity and Delta aircrafts by allowing Delta's wake turbulence and wing tip vortices to flip, invert and stall the Velocity resulting in its crash and Mr. Hunter's untimely death. More specifically, plaintiff alleges that the ATC failed to use good judgment in the routing of the two aircraft, failed to issue a wake turbulence warning or a safety alert to the Velocity, and failed to recommend that the Velocity change its course to avoid the wing tip vortices of the Delta. (Doc. 55 at p. 3). The plaintiff cites to both the FAA Air Traffic Control Handbook 7110.65G (Handbook) and case law to support her argument of ATC negligence. The Handbook, which is written and published by the FAA, outlines the ATCs responsibilities and procedures to be utilized while on the job. The Handbook specifically directs an ATC to use their best judgment in situations not explicitly covered by the Handbook. (Def Exh. 3 at Foreword & ¶ 1—1). Plaintiff states that the Handbook directs an ATC to "issue a safety alert to an aircraft if you are aware that the aircraft is at an altitude, which in your judgment, places it in an unsafe proximity to terrain, obstructions or other aircraft." *Id* at ¶ 2–6. Additionally, plaintiff contends that the ATC should have issued cautionary information to the Velocity concerning wake turbulence and what adverse effects it may have on it. *Id.* at ¶ 2–20(b). Plaintiff also claims that the ATC should "to the extent practical, clear large turbine engine-powered airplanes to/from the primary airport using altitudes and routes that avoid VFR corridors and airspace below the TCA floor where VFR aircraft are operating." *Id.* at ¶ 7–112(a).

In addition to citing several ATC Handbook regulations, plaintiff also cites to case law to further support her argument of ATC negligence in her claim against the United States. Plaintiff contends that the govern-

ment cannot limit its liability solely by relying on the ATC's Hand book, *Hartz v. United States,* 387 F.2d 870, 874 (5th Cir.1968), and states that where "the government undertakes to perform services, which in the absence of specific legislation would not be required, it will, nevertheless, be found liable if these activities are performed negligently." *Ingham v. United States,* 373 F.2d 227, 236 (2d Cir.1967), *cert. den.,* 389 U.S. 931, 88 S.Ct. 295, 19 L.Ed.2d 292 (1967).

The defendant counters plaintiff's arguments by stating that the ATC met or exceeded all regulations or guidelines, was not negligent in the performance of his duties, and was not responsible for the crash of the Velocity. Initially, the court notes that the defendant has not waived its sovereign immunity, thereby protecting the discretionary functions of its employees from suit. *See* 28 U.S.C. § 2680(a) (1994)(stating that the FTCA does not apply to any claim based upon an act or omission of an employee of the Government exercising due care in the execution of a statute or regulation ... whether or not the discretion involved was abused.) Additionally, both parties have stipulated that the ATC had met all published air traffic control separation standards by providing one and one half miles lateral separation, or five hundred (500) feet vertical separation, or visual separation between the two aircraft at all times. (Doc. 36, Joint Stipulation at p. 4–5).

In their attempt to rebut plaintiff's allegations, the defendant argues that the Velocity crash was caused by negligence of the pilot, Neil Hunter, rather than the ATC and thus the government should not be held liable in the present suit. The defendant, like the plaintiff previously, cites to federal aviation regulations and guidelines, case law and other evidence in support of its argument. First, the defendant claims that the FAA places the responsibility for the operation of an aircraft on the pilot in command and states that "the pilot in command of an aircraft is directly responsible for, and is the final authority as to, the operation of that aircraft." 14 C.F.R. § 91.3(a) (1996). Likewise, the defendant also states that it is the pilot's responsibility to avoid wake turbu-

lence while flying under VFR conditions. (Def. Exh. 1, Airman's Information Manual (AIM), § 5.82(a)(3) (1992)).

The defendant also cites to case law which states that during VFR flying conditions, the pilot has the primary responsibility to "see and avoid" other aircraft including any wake turbulence generated by those aircraft. *See First of America Bank–Cent. v. United States,* 639 F.Supp. 446, 454 (W.D.Mich. 1986); *Wasilko v. United States,* 300 F.Supp. 573 (N.D.Ohio 1967), *aff'd,* 412 F.2d 859 (6th Cir.1969)(same); *Miller v. United States,* 587 F.2d 991, 996 (9th Cir.1978)(same).

Lastly, the defendant argues that Mr. Hunter made modifications to the design of the Velocity which rendered it unstable and contributed to, if not directly caused, the Velocity crash. The defendant states that "no person may operate a civil aircraft unless it is in an airworthy condition," and that "the pilot in command of a civil aircraft is responsible for determining whether that aircraft is in condition for safe flight" 14 C.F.R. § 91.7 (1995). The defendant notes that Mr. Hunter received a builder's kit from Velocity Inc. with information and instructions on how to construct his Velocity aircraft. While building the aircraft, Mr. Hunter modified the company's designs and enlarged the fuel tanks. The defense contends that Mr. Hunter's modification caused the aircraft's center of gravity (CG) to shift aft making the aircraft unstable. In an FAA Advisory Circular, the FAA warned that "the aft c.g. limit is the most rearward position at which the c.g. can be located for the most critical maneuver or operation. As the c.g. moves aft, a less stable condition occurs, which decreases the ability of the aircraft to right itself after maneuvering or after disturbances by gusts." (Def. Exh. 9, AC 91–23A at p. 4). The defendant also introduced newsletters from Velocity Inc. which warned kit owners about the aircraft's potential instability. After learning of a crash involving one of their planes and conducting tests of their own, Velocity Inc. modified the aft CG limit on their planes from 123″ to 120″ from the nose of the plane to ensure more stability. (Def. Exh. 17). Lastly, the defendant introduced an instructional video of Dan Maher, the

President of Velocity Inc., where he assists kit owners in the construction and building of their experimental aircraft. The video cautioned the kit builders that any modifications to the original kit designs could have a significant impact on the planes CG and stressed the importance for the owner to perform several weight and balance checks on the plane at varying angles of attack to ensure that the aircraft is stable and has a proper CG measurement. Both the video and the newsletters informed the kit owners that if any of their modifications resulted in the plane's CG moving further aft, that the problem could be rectified by adding weights or ballast to the nose of the aircraft. The defendant claims that the Velocity's CG was further aft than recommended, and that the aircraft did not contain any weights or ballast in its nose when leaving Apalachicola on April 24, 1992, (Def. Exh. 14, Dr. Miller Depo. at 1), nor were any weights or ballast ever recovered from the nose at the crash site, other than the plane's battery.

■ After reviewing all the evidence presented at trial, the court concludes that the ATC acted properly in accordance with published ATC regulations and guidelines and that the negligence of Mr. Hunter, rather then an ATC, was the proximate cause of the April 24, 1992 crash of the Velocity aircraft. The court finds that the ATC followed all regulations pertaining to the minimum separation of aircraft and avoidance of wake turbulence guidelines, found at ¶ 7–113 and ¶¶ 2–19 & 20 of the ATC Handbook, respectively. (Def.Exh. 3). Additionally, the court notes that the pilot traveling under VFR or visual separation standards remains responsible for avoiding wing vortices and wake turbulence left by other aircraft. *See* AIM ¶ 5–82(a)(3) (which states that the pilot accepts responsibility for wake turbulence separation under visual separation conditions), and AIM ¶ 7–48(a) (which states that vortex avoidance during VFR operations must be exercised by the pilot). (Def.Exh. 1).

Next, a pilot traveling under VFR conditions must receive clearance from an ATC before operating his aircraft in that particular TCA. *See* 14 C.F.R. § 91.131 (1995). Robert Holderby, an ATC located at the Orlando International Airport, cleared the Velocity to enter the TCA. The court notes that while the Velocity was flying in the Orlando TCA, Mr. Hunter alone controlled the speed, direction and altitude of his aircraft. The ATC never ordered the Velocity to change direction or altitude during the course of his flight. Just prior to the Delta passage, the Velocity requested permission to change altitude and the ATC recommended that it descend to 7500 feet. (Def. Exh. 4 at p. 8). The evidence at trial showed that Mr. Hunter was under no obligation to follow the ATC's recommendation, and if he did not agree with the ATC's suggestion, Mr. Hunter simply could have requested a different altitude if he felt that descending to 7,500 feet would put him in jeopardy. The Velocity however did not request a different altitude and complied with the ATC's suggestion. The court finds that when Mr. Hunter later made a thirteen (13) degree left turn toward Merritt Island and the Delta's flight path, that he acted unilaterally under his sole discretion, and was not influenced by the ACT in any way.

■ Additionally, the court finds that as a retired military pilot and active private pilot with over thirty five years of aviation experience, Mr. Hunter is presumed to have extensive knowledge of wake turbulence and the effects of wing tip vortices. Meanwhile, Mr. Hunter was informed by the ATC that there was a commercial 727 aircraft in his vicinity. Since it remains the pilot's duty to avoid such wake turbulence exposure, Mr. Hunter should have given the Delta a wider berth and not knowingly put himself in danger of experiencing wake turbulence. An ATC is under no duty to warn a pilot of things that he would ordinarily know. *Worthington v. United States*, 807 F.Supp. 1545, 1568 (S.D.Ga.1992) (citing *Crossman v. United States*, 378 F.Supp. 1312, 1318 (D.Or. 1974))). Similarly, there is no duty to warn a pilot of a condition that he should already be aware of based on his training, experience and personal observations. *Id.* (*citing Neff v. United States*, 420 F.2d 115 (D.C.Cir.1969) *cert. den.*, 397 U.S. 1066, 90 S.Ct. 1500, 25 L.Ed.2d 687 (1970).

Lastly, the court finds that the modifications made to Mr. Hunter's Velocity aircraft rendered it an unstable aircraft. Mr. Hunter's enlargement of the Velocity's fuel tanks caused the CG of the plane to move dangerously aft. To rectify the problem, weights or ballast needed to be added in the nose of the plane. Although there was evidence at trial that Mr. Hunter had added the needed ballast in the nose of the aircraft on prior occasions, the court concludes that there was no ballast added on April 24, 1992. Once the Velocity turned thirteen (13) degrees to the left toward Merritt Island and back into the Delta's flight path, the Velocity encountered wake turbulence, flipped, and could not recover from an inverted stall. Because of the distance and length of time between the Delta's passage and the "mayday" call, the court concludes that the Delta's wake turbulence would not have effected a stable aircraft in a similar manner. The court notes that the pilot, and not the ATC, is charged with the responsibility of knowing those facts which are material to the safe operation of his flight, *Associated Aviation Underwriters v. United States*, 462 F.Supp. 674, 680 (N.D.Tex.1978) (citing *American Airlines v. United States*, 418 F.2d 180, 193 (5th Cir. 1969)), and that Mr. Hunter failed to exercise due caution by flying an aircraft with an aft CG into wake turbulence caused by a much larger commercial aircraft.

### III. Conclusion

The facts in this case clearly indicate that the ATC complied with all relevant FAA regulations concerning minimum separation of aircraft and resulting wake turbulence and was not negligent in the performance of his duties. In order to prevail on a negligence claim under Florida law, the plaintiff must prove: 1) that the defendant owed a duty of reasonable care to the plaintiff; 2) that the defendant breached that duty; 3) that the breach was the proximate cause of the injury to the plaintiff; and 4) that the plaintiff suffered damages. *Krehling*, 900 F.Supp. at 1582. The court finds that the plaintiff failed to prove the second and third prongs of the above test and thus concludes that the ATC was not negligent in this instant case.

The court also finds that Mr. Hunter, as the pilot and builder of the experimental Velocity aircraft knew or should have known: 1) that his Velocity aircraft had an aft CG based upon the modifications he performed on the plane and the various newsletters supplied to him by the Velocity company; 2) that he did not add weights or ballast in the nose of the plane on April 24, 1992 as recommended by the Velocity company; and 3) the effects of wake turbulence and wing tip vortices as a result of over thirty five years of aviation experience in both the military and as a private pilot. The court finds that the wake turbulence of the Delta flight after six (6) miles would have dissipated to the extent that it could not have significantly disrupted a stable aircraft. Thus, because the court concludes that the plaintiff has failed to meet her burden of proof, it rules in favor of the defendant and orders the Clerk of Court to enter judgment accordingly.